UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWARD SULLIVAN, HEATHER SULLIVAN, DOE CHILD 1, DOE CHILD 2, DOE CHILD 3 and DOE CHILD 4, *Plaintiffs*, VS. TOWN OF WALPOLE, MA, WALPOLE POLICE DEPARTMENT, CHIEF JOHN F. CARMICHAEL, JR., OFFICER ANDREW KIEWLICZ, DET. MICHAEL BENNER, DET. SGT. RICHARD KELLEHER, OFFICER THOMAS HART, DET. KYLE GRIFFIN, OFFICER MATTHEW CROWN, WALPOLE SCHOOL DEPARTMENT and VICE PRINCIPAL LEE TOBEY, *Defendants*. | C.A. No. 1:20-cv-10484-GAO |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT UNDER RULE 56

## I.    INTRODUCTION

In this action, plaintiff, Edward Sullivan, his wife, Heather Sullivan, and their four minor children, seek relief against defendants, former Walpole Police Chief John F. Carmichael, Jr., Officer Andrew Kiewlicz, Det. Michael Benner, Det. Sgt. Richard Kelleher, Officer Thomas Hart, Det. Kyle Griffin, Officer Matthew Crown, and Walpole High School ("WHS") Vice Principal Lee Tobey (hereinafter "defendants"), for harm plaintiffs allegedly sustained as a result of an investigation conducted by the Massachusetts Department of Children & Families ("DCF") into Mr. Sullivan's suspected physical abuse of his fifteen-year-old daughter, SS. On October 24, 2018, SS, a sophomore at WHS, attended school with visible bruises on both cheeks, and admitted to a student-friend that the bruises were inflicted by her father, Edward Sullivan. After the friend notified Vice Principal Tobey of SS's admission, Ms. Tobey, a mandated reporter, reported the suspected abuse to DCF. See G.L. c. 119, § 51A. The DCF screener immediately treated the report

as an "emergency report" that posed "a threat of immediate danger to the life, health, or physical safety of the child …." 110 CMR 4.25(1)(b). DCF accordingly instructed the Walpole Police Department ("WPD") and Walpole Public Schools ("WPS") to temporarily detain SS and her three younger siblings, TS, CS and BS, until it could determine that the health and safety of the children were not in immediate danger from further abuse. G.L. c. 119, § 51B(c). Each child was subsequently detained for periods ranging from three to four hours while DCF conducted its emergency response. 110 CMR 4.26(1). That same afternoon, WPD arrested Mr. Sullivan on a charge of domestic assault and battery. G.L. c. 265, § 13A. At the time of the arrest, WPD officers had probable cause to believe Mr. Sullivan had committed domestic abuse based on (1) SS's bilateral facial bruises; (2) SS's disclosure to the student-friend (the "first complaint witness") that her father had inflicted the bruises; and (3) the failure of SS's brother, CS, to corroborate SS's story that the bruises were caused either by CS's fall from an upper bunk and/or a dropped water bottle. The Norfolk County District Attorney's Office ultimately failed to prosecute the case. On October 31, 2018, DCF concluded that while of "concern," the allegation of physical abuse of SS by her father was "unsupported."

Plaintiffs filed a four Count complaint in Norfolk Superior Court asserting the following claims against eleven known defendants, including (but not limited to) the Town of Walpole:

| | |
|---|---|
| **Count I** | 42 U.S.C. § 1983 – unreasonable seizures and denials of due process in violation of the Fourth, Fifth and Fourteenth Amendments; |
| **Count II** | 42 U.S.C. § 1983 – conspiracy to conduct unreasonable seizures, and to deny due process and equal protection in violation of the Fourth, Fifth and Fourteenth Amendments; |
| **Count III** | M.G.L. c. 12, §§ 11H & 11I – denials of equal protection in violation of the Massachusetts Civil Rights Act ("MCRA"); and |
| **Count IV** | Intentional infliction of emotional distress. |

Defendants removed the case to Federal Court and, after initially filing an Answer (ECF Doc. No. 12), filed a Motion for Judgment on the Pleadings under Fed.R.Civ. P. 12(c). (ECF Doc.

No. 13). On June 21, 2020, this Court granted in part and denied in part defendants' Rule 12(c) Motion. (ECF Doc. No. 25).[1] The eight remaining individual defendants now submit this Memorandum of Law in support of their Motion for Summary Judgment on plaintiffs' two surviving claims – Counts I and IV.

## II.     UNDISPUTED FACTS[2]

Plaintiffs, Edward Sullivan, Heather Sullivan, and their four minor children, SS, TS, CS and BS, are residents of Walpole, MA. (SOF ¶ 1). In the Fall of 2018, all four children attended Walpole Public Schools; fifteen-year-old SS was enrolled as a sophomore at WHS. (SOF ¶ 4, 5). On October 24, 2018, a friend and fellow WHS student, KC, questioned SS about visible bruising on her cheeks. (SOF ¶ 6). SS told the friend the bruising was inflicted by her father. (SOF ¶¶ 7, 12). SS, however, said she "did not want to talk about it" and, if she did, it would "destroy [her] family." (SOF ¶¶ 13, 14). In her deposition, SS admitted the bruise on her right cheek "looked fresh and recent" when viewed by KC, as it happened the night before. (SOF ¶ 16). The fellow student reported what SS had said – *i.e.*, that the bruising was inflicted by her father – to school authorities, and WHS Vice Principal Lee Tobey subsequently questioned SS. (SOF ¶¶ 7, 8).  SS denied they were caused by her father and explained the bruising was caused instead by an accident with her brother.   (SOF ¶¶ 8, 17 ). Vice Principal Tobey, a mandated reporter, filed a Section 51A report with DCF and informed School Resource Officer ("SRO") Thomas Hart of the report, who in turn informed WPD Detective Benner. (SOF ¶¶ 9, 10, 18). DCF treated the report as an "emergency report" which triggered an "emergency response." (SOF ¶ 19). DCF's immediate

---

[1] Specifically, the Court dismissed plaintiffs' conspiracy (Count II) and MCRA (Count III) claims as against all defendants and Section 1983 (Count I) and intentional infliction of emotional distress (Count IV) claims as against the Town.

[2] Pursuant to Local Rule 56.1, defendants have submitted the accompanying Joint Statement of Material Facts, which is incorporated herein by reference. See Stmt. of Facts ("SOF").

priority was to interview the children as soon as possible – within two hours. (SOF ¶¶ 21, 22). Because it was the end of the school day and the children were about to return home, DCF decided to immediately interview the children at their respective schools. (SOF ¶¶ 23, 25). DCF accordingly directed the WPD and WPS to temporarily detain the children at their schools until DCF could interview them.  (SOF ¶¶ 23, 24).

DCF Investigator David Skutul responded first to Fisher Elementary School where he interviewed both CS and BS. (SOF ¶ 35, 37). CS denied he fell on SS and/or dropped a water bottle on her. (SOF ¶ 38). In fact, CS told Investigator Skutul that he did not even sleep in the upper bunk the previous night.  (SOF ¶ 39).  WPD officers attended the interviews but did not participate in the questioning.  (SOF ¶  37). Investigator Skutul then went to WHS where he interviewed SS.  (SOF ¶ 27). As soon as SS entered the room, Investigator Skutul observed bilateral bruises on SS's face – a recent, larger red and blue bruise on SS's right cheek and a smaller, lighter bruise on SS's left cheek. (SOF ¶ 29). Investigator Skutul asked SS how she sustained the bruises. SS said her brother CS does "weird stuff" on the upper bunk and "had dropped down on her as well as causing the water bottle to fall on her." (SOF ¶ 30). SS denied any abuse by her father. (SOF ¶ 28). Investigator Skutul harbored doubts regarding the accuracy of SS's story. (SOF ¶ 31). He asked SS if he could take pictures of her bruises; SS declined. (SOF ¶ 33). In Investigator Skutul's experience, 90% of alleged abuse victims permit investigators to photograph any visible marks or bruises. (SOF ¶ 34). SS's younger sister, TS, was not in school at the time of the DCF investigation. (SOF ¶ 40). At the close of the school day, she had gone to the home of a classmate. (Id.). At the direction of DCF, WPD requested the classmate's parents to temporarily detain TS until Investigator Skutul had an opportunity to interview her. (SOF ¶ 41). The parents agreed. (Id.). Investigator Skutul interviewed TS alone at her classmate's home. (SOF

¶ 42). TS denied any knowledge of her sister's bruises. (Id,).  Later that evening, Investigator Skutul conducted a home visit at the Sullivan residence. (SOF ¶ 49). While there, he observed that the upper bunk in SS's and CS's bedroom had only sheets on the bed, while the lower bunk had sheets, blankets and a pillow. (SOF ¶ 50).

At approximately 4:00 p.m., Detective Ian Tolland[3] arrested Mr. Sullivan on suspicion of domestic assault and battery. (SOF ¶¶ 43, 44). Officer Matthew Crown (Detective Tolland's backup) transported plaintiff to the Walpole Police Station. (SOF ¶ 44).  There, Detective Michael Benner and Officer Andrew Kiewlicz interviewed Mr. Sullivan, who denied assaulting his daughter. (SOF ¶¶ 45, 47). Mr. Sullivan was released from WPD custody on personal recognizance around 10:00 p.m. and 11:00 p.m. that evening. (SOF ¶ 52). The following day, Mr. Sullivan appeared in Wrentham District Court, but was not arraigned due to a purported conflict. (SOF ¶¶ 57, 58, 59, 60). The Norfolk County District Attorney's Office declined to prosecute Mr. Sullivan for reasons unknown to defendants. (SOF ¶ 60). On November 28, 2018, a special prosecutor filed a notice of *nolle prosequi*. (Id.).  At the close of its investigation, DCF found the allegation of physical abuse of SS by her father "unsupported[,]" concluding "it is unclear as to how the injury was sustained, the Department does not have enough evidence to support that the bruising was caused by any action taken by her father." (SOF ¶¶ 53, 54). DCF nonetheless noted its concern that SS "offered three varying explanations as to how she sustained the bruising …." (Id.).

During discovery, defendants originally noticed plaintiff TS's deposition for February 18, 2022. (SOF ¶ 62). Plaintiffs' counsel, however, informed defense counsel that he did not believe TS would submit to a deposition. (SOF ¶ 63). Defense counsel offered to forgo conducting TS's deposition if TS agreed, in turn, to dismiss her case; plaintiffs refused. (SOF ¶ 65). On March 30,

---

[3] Detective Tolland is not a party to this case.

2022, defendants filed a Motion to Compel TS's deposition. (SOF ¶ 66). On June 10, 2022, this Court allowed defendants' Motion to Compel. (Id.). In her Order, the Magistrate Judge ruled that: "[i]f T.S. fails to appear for her deposition, the defendants may seek sanctions, including a request that her case be dismissed." (ECF Doc. No. 52). On August 17, 2022, defendants re-noticed TS's deposition. (SOF ¶ 69). By email dated August 22, 2022, plaintiffs' counsel confirmed that, in violation of the Court Order, TS did not intend to appear for her deposition. (SOF ¶ 70).

### III.   STANDARD OF REVIEW

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Once the movant avers 'an absence of evidence to support the nonmoving party's case, ... the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" Sheinkopf v. Stone, 927 F.2d 1259, 1261 (1st Cir. 1991). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the [fact finder] could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). While a court must examine the record in the light most favorable to the opposing party, "Rule 56 does not invite a court to enter the realm of surmise." Local 48 v. United Brotherhood of Carpenters & Joiners, 920 F.2d 1047, 1051 (1st Cir. 1990). This Court should ignore bald assertions and mere speculation as well as allegations "which have been conclusively contradicted by concessions or otherwise." Chongris v. Bd. of Appeals, 811 F.2d 36, 37 (1st Cir. 1987).

### IV.   ARGUMENT

**A.   Defendants Did Not Violate Plaintiffs' Fourth Amendment Rights to be Free From Unreasonable Seizures and, Therefore, Cannot be Held Liable Under 42**

**U.S.C. § 1983 (Count I).**

The Fourth Amendment protects the right of people "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures . . .." U.S. Const., amend. IV. Section 1983 "creates a remedy for violations of federal rights committed by persons acting under color of state law." Sanchez v. Pereira-Castillo, 590 F.3d 31, 40 (1st Cir. 2009) (quoting Haywood v. Drown, 556 U.S. 729, 730 (2009)). To recover under 42 U.S.C. § 1983 for a Fourth Amendment violation, a plaintiff must prove that the defendant acted under color of state law, and that defendant's conduct deprived him of the right to be free from unreasonable searches and seizures. As the Supreme Court has observed, the purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." Camara v. Municipal Court, 387 U.S. 523, 528 (1967). Thus, while a government search or seizure of one's person or property may be intrusive, it will, at times, be necessary for the common good. The underlying command of the Fourth Amendment is that a search or seizure must be "reasonable," and what is reasonable depends on the context of the search or seizure. A "seizure" of a person occurs when his freedom of movement is terminated or otherwise restricted "by means of physical force or show of authority." Terry v. Ohio, 392 U.S. 1, 19, n.16 (1968). For the reasons addressed below, defendants' arrest of Mr. Sullivan and temporary detention of his children do not qualify as unreasonable seizures in violation of plaintiffs' Fourth Amendment rights.[4]

1.  Defendants Had Probable Cause to Arrest Plaintiff, Edward Sullivan.

To demonstrate probable cause, a police officer must have more than suspicion that a suspect has engaged in criminal activity. The officer must have knowledge of facts and circumstances based on reasonably trustworthy information which are "'sufficient in themselves

---

[4] Plaintiff, Heather Sullivan, states no Fourth Amendment violation whatsoever.

to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-176 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). Whether probable cause exists depends upon the reasonable conclusion to be drawn from those facts, known to the arresting officer, at the time of the arrest. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Notably, "[p]robable cause 'is not a high bar.'" Charron v. County of York, 49 F.4th 608, 616 (1st Cir. Sept. 27, 2022) (quoting District of Columbia v. Wesby, 138 S.Ct. 577, 586 (2018)). Even where a witness account is disputed, "police officers do not have an 'unflagging duty' to complete a full investigation before making a probable cause decision." Karamanoglu v. Town of Yarmouth, 15 F.4th 82, 88 (1st Cir. 2021) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004)). See Holder v. Town of Sandown, 585 F.3d 500, 505 (1st Cir. 2009) (officer need not investigate potential defenses or resolve conflicting accounts prior to making arrest). Rather, probable cause "requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." United States v. Mulkern, 49 F.4th 623, 629 (1st Cir. 2022) (quoting United States v. Rasberry, 882 F.3d 241, 250 (1st Cir. 2004)).

Mr. Sullivan was first "seized" when Detective Tolland executed a motor vehicle stop of his vehicle. United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012). In light of the collective knowledge of other WPD officers involved in the investigation, and specifically the knowledge of Detective Kelleher, Detective Tolland's motor vehicle stop was based on a reasonable and articulable suspicion of criminal activity and, therefore, lawful. See Morelli v. Webster, 552 F.3d 12, 17 (1st Cir. 2009) (when officer who has probable cause directs another officer who lacks knowledge to make an arrest, directing officer's knowledge is imputed to arresting officer); Illinois v. Andreas, 463 U.S. 765, 771 n.5 (1983) (where law enforcement authorities cooperate in

investigation, "knowledge of one is presumed shared by all.") Detective Tolland also had probable cause to effect a warrantless arrest of Mr. Sullivan for domestic assault and battery.[5] (SOF ¶ 43). At the time of the arrest, Detective Kelleher knew the following facts and circumstances:

- SS had visible bruising on both cheeks (SOF ¶¶ 11, 16, 29);
- A friend and fellow student, KC, reported to WHS authorities that SS told her the bruising was inflicted by her father (SOF ¶¶ 7 & 11);
- SS denied to WPS authorities that her father struck her and claimed the bruising was caused instead by her younger brother who fell out of an upper bunk and/or dropped a water bottle on her (SOF ¶¶ 15, 17, 28); and
- SS's younger brother failed to corroborate SS's story (SOF ¶ 38).

The facts and circumstances imputed to Detective Tolland provided ample probable cause for Mr. Sullivan's arrest. SS's denial that her father struck her does not render the arrest devoid of probable cause, nor does the fact that KC's and SS's accounts regarding the cause of the bruising differed. See Holder, 585 F.3d at 506 (affirming summary judgment where arrest was supported by probable cause notwithstanding differing accounts of alleged assault and battery). Indeed, the Supreme Court has flatly rejected the notion that police must investigate specific defenses before finding probable cause. See Baker v. McCollan, 443 U.S. 137, 145–46 (1979) ("The Constitution does not guarantee that only the guilty will be arrested.") Here, despite SS's denial that she was physically abused by her father, the information known to WPD officers at the time of arrest was more than sufficient to clear the low bar of probable cause. Charron, 49 F.4th at 617-18 (arresting officers had probable cause to arrest plaintiff despite fact that subsequent investigation revealed different chain of events preceding arrest). See Godette v. Stanley, 490 F. Supp. 2d 72, 77 (D. Mass. 2007) ("Probable cause is a relatively low standard for police officers to meet").

---

[5] Massachusetts law authorizes a police officer to make a warrantless arrest if the officer has probable cause to believe that the person "has committed a misdemeanor involving abuse as defined in [G.L. c. 209A, § 1] …." G.L. c. 209A, § 6(7)(b). "Abuse" is defined as certain acts between family or household members, including "(a) attempting to cause or causing physical harm …." G.L. c. 209A, § 1.

Likewise, the fact that Mr. Sullivan was not ultimately charged with domestic assault and battery does not compel a finding that the arresting officer lacked probable cause. The probable cause standard does not require the level of proof needed to secure a conviction, nor even an "unusually high degree of assurance." United States v. Centeno-González, 989 F.3d 36, 45 (1st Cir. 2021) (quoting United States v. Clark, 685 F.3d 72, 76 (1st Cir. 2012)). The First Circuit has, on multiple occasions, concluded that probable cause existed notwithstanding a later failure to prosecute. See, *e.g.*, Charron, 49 F.4th at 618; Holder, 585 F.3d at 503.

Massachusetts law expressly encourages an arrest under the facts and circumstances presented here. Whenever a police officer has reason to believe that a family member has been abused or is in danger of being abused, "such officer *shall* use all reasonable means to prevent further abuse." G.L. c. 209A, § 6 (emphasis added). Indeed, "arrest *shall be the preferred response* whenever an officer … has probable cause to believe that a person …" has committed domestic abuse. G.L. c. 209A, § 6(7) (emphasis added). Further, "[t]he safety of the victim and any involved children *shall be paramount* in any decision to arrest." Id. (emphasis added). Finally:

> No law officer shall be held liable in any civil action regarding personal injury or injury to property brought by any party to a domestic violence incident for an arrest based on probable cause when such officer acted reasonably and in good faith and in compliance with this chapter and the statewide policy as established by the secretary of public safety.[6]

Id. Defendants do not contend that Chapter 209A, Section 6(7) provides a defense to plaintiff's Section 1983 claim. However, the nature of a probable cause determination may "be shaped to accord with a State's pretrial procedure viewed as a whole." Gerstein v. Pugh, 420 U.S. 103, 123

---

[6] Under "Domestic Violence Law Enforcement Guidelines 2017," published by the Massachusetts Executive Office of Public Safety & Security, a decision to arrest should be based on probable cause, "not on whether the victim wishes to seek complaints or wishes to testify at a future date." https://www.mass.gov/doc/2017-domestic-violence-law-enforcement-guidelines/download   See Kader v. Sarepta Therapeutics, Inc., 2016 WL 1337256, at *11 (D. Mass. April 5, 2016) (court may take judicial notice of official statements published on government website).

(1975). See <u>Price v. Mori</u>, 2021 WL 352351, at *4 (D. Mass. Feb. 1, 2021) (officers had probable cause to arrest plaintiff following altercation with ex-wife). Defendants are entitled to summary judgment on Mr. Sullivan's Fourth Amendment claim under Section 1983.

2. <u>Defendants' Temporary Detention of SS, TS, CS and BS at the Request of DCF was Reasonable.</u>

Assuming the minor plaintiffs were "seized" within the meaning of the Fourth Amendment when WPD officers, at the direction of DCF, instructed WPS officials to temporarily detain them while DCF completed its "emergency response," such seizures were reasonable under all facts and circumstances.[7] The minor plaintiffs were not arrested; rather, they were temporarily detained (at the express request of DCF) while Investigator Skutul conducted his investigation. Therefore, no warrant based on probable cause was required. More importantly, the express purpose of the DCF investigation was to protect the health and safety of the children by ensuring that they were not returned to an abusive environment.[8] The Supreme Court has not yet articulated the standard to be applied to an in-school seizure of a child for questioning during a child abuse investigation. Although the Circuit Courts appear split on the issue, the First Circuit has held that it is sufficient to detain a child for questioning if authorities had a reasonable suspicion of an imminent threat to the health or safety of the child. <u>Wojcik v. Town of North Smithfield</u>, 76 F.3d 1 (1st Cir. 1996). In <u>Wojcik</u>, local school officials transported a fifth-grade student from one school to another so that a DCF investigator could interview her and a sibling together in the same location regarding suspected child abuse. School officials had neither a warrant issued on probable cause nor parental consent. The First Circuit ruled that there was no Fourth Amendment violation.

---

[7] As discussed above, TS was no longer in WPS custody at the time of the DCF investigation.
[8] Upon initiating an "emergency response," the first priority of DCF "is to view the child(ren) in question, and to determine the condition of any other children residing in the same household." 110 CMR 4.26(1).

The Fourth Amendment … protects against *unreasonable* seizures. Nothing in the present facts made it unreasonable for the school, acting *in loco parentis*, to move one of the children from one school to another school in the vicinity, so that both children could be questioned together by a state official following upon a possible abuse report made by one of the teachers. The claim fails both on the merits and the qualified immunity grounds.

Id., at 3 (emphasis in original). While the First Circuit did not articulate the precise standard it was applying, it nonetheless cited with approval New Jersey v. T.L.O., 469 U.S. 325 (1985), where the Supreme Court held that school officials do not need a warrant or probable cause to conduct a student search, provided the search is justified at its inception and, as conducted, is "reasonably related in scope to the circumstances which justified the interference in the first place." Id., at 340-41. This is the "reasonable suspicion" standard. See United States v. Tom, 988 F.3d 95, 99 (1st Cir. 2021) (citing New Jersey v. T.L.O. as source of "reasonable suspicion" standard).

Defendants' actions regarding the minor plaintiffs were lawful under the "reasonable suspicion" standard. As a mandated reporter, Vice Principal Tobey was required by law to *immediately* file a report with DCF if she had "reasonable cause to believe that a child is suffering physical or emotional injury resulting from: (i) abuse inflicted upon [her] which causes harm or substantial risk of harm to the child's health or welfare …." G.L. c. 119, § 51A(a); 118 CMR 3.03(1).[9] The "reasonable cause" standard "serve[s] a threshold function, thereby implying a relatively low degree of accuracy." Wilmot v. Tracey, 938 F. Supp. 2d 116, 129 (D. Mass. 2013) (quoting Care & Protection of Robert, 408 Mass. 52, 63 (1990)). Vice Principal Tobey's report, made in good faith, justified DCF's initiation of an "emergency response" and DCF's solicitation of the cooperation and assistance of the WPD and WPS in conducting that response. G.L. c. 119, § 51B(c); 110 CMR 4.25(b)(1). (SOF ¶¶ 54, 55). Investigator Skutul wanted "to view the children

---

[9] Vice Principal Tobey's failure to report suspected abuse could be punishable by a fine of up to $1,000. G.L. c. 119, § 51A(c).

as soon as possible." (SOF ¶ 22). The situation, he testified, called for "some urgency." (Id.). Based on DCF's request to temporarily detain the minor plaintiffs pending Investigator Skutul's investigation, defendants had a reasonable suspicion of an imminent threat to the children's safety; therefore, it was not unreasonable for them to temporarily detain the children for questioning by Investigator Skutul. To hold otherwise would effectively discourage law enforcement and school personnel from cooperating or assisting in future DCF emergency responses for fear of incurring personal liability.

The "emergency aid" exception to the "exigent circumstances" doctrine also "allows a warrantless entry [of property] based on 'the need to assist persons who are seriously injured or threatened with such injury.'" Hill v. Walsh, 2017 WL 2818987, at *3 (D. Mass. June 29, 2017) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). Defendants had a reasonable basis to believe that, by temporarily detaining the minor plaintiffs at the request of DCF, they were assisting DCF in protecting the children from threatened injury. See Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 21 (1st Cir. 2001) ("Indeed, evidence of even a single instance of abuse may constitute an exigent circumstance sufficient to warrant immediate state action on a child's behalf.") Defendants are entitled to summary judgment on the minor plaintiffs' Fourth Amendment claims under Section 1983.

**B.**    **Defendants Did Not Violate Plaintiffs' Family Integrity Rights as Protected Under the Due Process Clause and, Therefore, Cannot be Held Liable Under 42 U.S.C. § 1983 (Count I).**

Familial relationships between parents and children merit constitutional protection through the substantive Due Process Clause of the Fourteenth Amendment. Lehr v. Robertson, 463 U.S. 248 (1983). Along these lines, and as a subset of the right to familial integrity, is the parental

interest in the care, custody and control of their children. <u>Hatch</u>, 274 F.3d at 20.[10] Likewise,

children have a corresponding liberty interest in being in the care and custody of their parents.

<u>Suboh v. District Attorney's Office of Suffolk Dist.</u>, 298 F.3d 81, 91 (1st Cir. 2002). Yet, the scope

of this protected interest "is far from clear." <u>Connor B., <em>ex rel.</em> Vigurs v. Patrick</u>, 774 F.3d 45, 58

(1st Cir. 2014). The protected interest is a "limited one" that must be "balanced against the state's

right to investigate allegations of abuse or neglect and take appropriate remedial action." <u>Id.</u>, at 58

(citations omitted). "The right to family integrity clearly does not include a constitutional right to

be free from child abuse investigations." <u>Watterson v. Page</u>, 987 F.2d 1, 8 (1st Cir. 1993) (quoting

<u>Stanley v. Illinois</u>, 405 U.S. 645, 649 (1972)).

> The government has a compelling interest in the welfare of children, and the relationship
> between parent and child may be investigated and terminated by the state provided
> constitutionally adequate procedures are followed.

<u>Watterson</u>, 987 F.2d at 8. Thus, in <u>Hatch</u>, the Court held that a case worker may take temporary

custody of a child without a hearing if he has "a reasonable suspicion that child abuse has occurred

(or alternatively, that a threat of abuse is imminent)." <u>Hatch</u>, 274 F.3d at 22. See <u>Kauch v. Dep't

for Children, Youth & Their Families</u>, 321 F.3d 1, 4 (1st Cir. 2003) (father's constitutional rights

to family integrity held not violated where case worker, faced with reasonable suspicion of abuse,

recommended family monitoring). Here, DCF did not violate plaintiffs' rights to family integrity

by temporarily detaining the children for questioning following Vice Principal Tobey's submission

of a Section 51A report. Nor did defendants violate such rights by cooperating and assisting in

DCF's "emergency response." In addition, to prevail under a substantive due process claim,

plaintiffs must show that defendants' conduct was so "extreme, egregious, or outrageously

---

[10] In <u>Hatch</u>, the First Circuit explicitly recognized the "difficult choices" faced by case workers
investigating allegations of abuse, who "operate under enormous pressure" and must make "on-
the-spot judgments on the basis of limited and often conflicting information." 274 F.3d at 22.

offensive" as to "shock the conscience." <u>Aguilar v. U.S. Immigration & Customs Enforcement</u> <u>Div. of Dep't of Homeland Sec.</u>, 510 F.3d 1, 21-22 (1st Cir. 2007). Plaintiffs can make no such showing here. Defendants are entitled to summary judgment on plaintiffs' due process claims.

### C. Defendants are Entitled to Qualified Immunity Under Count I.

Even if they violated plaintiffs' Fourth Amendment and due process rights, defendants are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). This means that unless any reasonable person in the position of the individual defendant would have known his behavior was plainly unlawful at the time it occurred, the individual defendant is immune. <u>Barton v. Clancy</u>, 632 F.3d 9, 26-27 (1st Cir. 2011). The protection is more than a defense to liability; it is an immunity from suit. <u>Saucier v. Katz</u>, 533 U.S. 194, 200-201 (2001) (citation omitted). The First Circuit employs a two-step analysis to decide the issue of qualified immunity. <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st Cir. 2009). First, it considers whether plaintiff's allegations, if true, establish a constitutional violation. Second, it looks at whether the right invoked was "clearly established" at the time of the alleged misconduct. <u>Air Sunshine, Inc. v. Carl</u>, 663 F.3d 27, 32-33 (1st Cir. 2011). This second prong provides "breathing room" to defendants "by affording them immunity even when they make reasonable mistakes about the lawfulness of their conduct." <u>Estate of Rahim, by</u> <u>Rahim v. Doe</u>, __ F.4th __, 2022 WL 11602542, at *6 (1st Cir. Oct. 20, 2022). Importantly, it is plaintiffs' burden to demonstrate that the law was "clearly established" and it is "a heavy burden indeed." <u>Id.</u> (quoting <u>LaChance v. Town of Carlton</u>, 990 F.3d 14, 20 (1st Cir. 2021)).

1. <u>Unlawfulness of Arrest of Plaintiff, Edward Sullivan, on Charge of Domestic Assault</u> <u>and Battery, was not Clearly Established Under the Fourth Amendment.</u>

"[I]n the case of a warrantless arrest, if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach." <u>Cox v. Hainey</u>, 391 F.3d 25, 31 (1st Cir. 2004). The operative inquiry is whether, "the unlawfulness of the arrest would have been apparent to an objectively reasonable officer" standing in the shoes of Detective Tolland at the time of Mr. Sullivan's arrest. <u>Id</u>. Here, Detective Tolland had probable cause to arrest Mr. Sullivan based on the collective knowledge of the WPD, including visible evidence of bruising on SS's cheeks, KC's report to school authorities that SS had admitted her father inflicted the bruising, and the failure of the younger brother, CS, to corroborate SS's story. (SOF ¶¶ 7, 29, 38). On this record, it simply cannot be said that Detective Tolland *clearly* did not have probable cause at the time he arrested Mr. Sullivan. <u>Floyd v. Farrell</u>, 765 F.2d 1, 5 (1st Cir. 1985) (holding police officer entitled to qualified immunity despite finding of no probable cause at later hearing). Defendants are, therefore, entitled to qualified immunity with respect to the arrest of Mr. Sullivan.

2. <u>Unlawfulness of Temporary Detention of SS, TS, CS and BS at Request of DCF was not Clearly Established Under Fourth Amendment and/or Due Process Clause.</u>

Defendants are also entitled to qualified immunity for their supportive role in DCF's abuse investigation. As noted above, the right to family integrity is neither absolute nor unqualified; rather, it must be balanced against the government's compelling interest in the health, education, and welfare of children as future citizens. <u>Frazier v. Bailey</u>, 957 F.2d 920, 929 (1st Cir. 1992). See <u>Connor B.</u>, 774 F.3d at 58 (scope of family integrity interests "is far from clear"). Due to the amorphous nature of the right to family integrity, and the balancing of interests involved, "it is difficult, if not impossible, for officials to know when they have violated 'clearly established' law." <u>Frazier</u>, 957 F.2 at 931 (citing <u>Baker v. Racansky</u>, 887 F.2d 183, 187 (9th Cir. 1989)).

Here, the legal contours of plaintiffs' rights to familial integrity were not so clearly established as to put defendants on notice that their conduct was unlawful. Moreover, where DCF is authorized to take a child into immediate temporary custody to protect the child from further abuse or neglect, it follows that defendants could not have known that their actions in support of DCF's "emergency response" were plainly unlawful. See Garfield v. McLaughlin, 2012 WL 474126, at *3 (D. Mass. Feb. 13, 2012) (holding DCF employees entitled to qualified immunity); Lucia v. City of Peabody, 971 F. Supp. 2d 153, 165 (D. Mass. 2013) (in protective custody context, reasonable officer could have concluded that detaining an individual for less than 12 hours when suitable treatment facility had not been located did not violate Constitution). Defendants are, therefore, entitled to qualified immunity with respect to plaintiffs' substantive due process claims.

### D. Plaintiffs Cannot Recover Under Count IV for Intentional Infliction of Emotional Distress.

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish that the defendant's intentional conduct was "extreme and outrageous." Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997). Extreme and outrageous conduct is behavior that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Foley v. Polaroid Corp., 400 Mass. 82, 508 N.E.2d 72, 82 (1987) (internal quotation and citation omitted). "The standard for making a claim of intentional infliction of emotional distress is very high." Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996). The summary judgment record does not permit a finding that defendants' conduct meets that high standard.

The undisputed facts demonstrate that, at all times, the WPD and WPS acted reasonably and in good faith in cooperating with and assisting DCF in its statutorily mandated investigation of suspected abuse. Even putting a harsh face on the actions of the defendants, see Hankey v. Town

of Concord-Carlisle, 136 F. Supp. 3d 52, 74 (D. Mass. 2015) (citing Tetrault, 425 Mass. at 466); defendants' response was not, as a matter of law, so extreme and outrageous as to constitute intentional infliction of emotional distress. Id. As to the arrest of Mr. Sullivan, making an arrest pursuant to ample probable cause cannot be considered "utterly intolerable in a civilized community." Sietins v. Joseph, 238 F. Supp. 2d 366, 379 (D. Mass. 2003) (granting summary judgment to police officers who were "merely carr[ying] out their obligations as law enforcement officials . . . ."). Even assuming, *arguendo*, that the arrest of Mr. Sullivan was unlawful, unlawful arrests alone do not constitute extreme and outrageous behavior. Finamore v. Miglionico, 2020 WL 5100763, at *6 (D. Mass. June 24, 2020), *aff'd*, 15 F.4th 52 (1st Cir. 2021). Nothing in the record indicates that the WPD's conduct in effecting the *lawful* arrest of Mr. Sullivan rises to the level of "extreme and outrageous" sufficient to support liability against defendants for Count IV.

Likewise, plaintiffs cannot establish that defendants' conduct with respect to Heather Sullivan, SS, TS, CS or BS rises to the extreme and outrageous level. As an initial matter, defendants, at the direction of DCF, merely played a supportive role in DCF's "emergency response" based on visible bruising and Vice Principal Tobey's statutorily-mandated report of suspected abuse. Furthermore, TS, CS, and BS were interviewed by DCF Investigator Skutul, not by defendants. (SOF ¶ 37, 42). Even if the record supports a finding that defendants' actions in assisting DCF's investigation were "misguided" or that defendants somehow "mishandled" the situation (which defendants deny), plaintiffs cannot meet the high bar for establishing this claim.[11] Morgan v. Town of Lexington, 138 F. Supp. 3d 82, 94 (D. Mass. 2015), *aff'd sub nom.*, Morgan v. Town of Lexington, MA, 823 F.3d 737 (1st Cir. 2016) (in school bullying context, dispatching

---

[11] The First Circuit has noted in the context of claims for intentional infliction of emotional distress that "the Massachusetts cases are demanding." Kennedy v. Town of Billerica, 617 F.3d 530, 530 (1st Cir. 2010).

police officers to victim's home after school absence held neither extreme nor outrageous). Furthermore, even if the temporary detention of SS, TS, CS and BS was unsettling to the children or their parents, Massachusetts courts have found such claims of nervousness insufficient to support a claim of intentional infliction of emotional distress. Kennedy v. Town Of Billerica, 617 F.3d 520, 530 (1st Cir. 2010) (upholding summary judgment where fourteen-year-old arrestee testified he feared arresting officer; arrest made him nervous and caused nightmares). Defendants are entitled to summary judgment under Count IV.

### E. Plaintiff, TS, Failed to Comply With a Court Order and, Therefore, her Claims Must be Dismissed.

Defendants are entitled to notice the deposition of a party to an action without leave of court. Fed.R.Civ.P. 30(a)(1). A party's refusal to submit to discovery may form a legally sufficient basis for the dismissal of their action. See Brady v. Hearst Corp., 281 F. Supp. 637, 643 (D. Mass. 1968) (dismissing plaintiff's claims for, *inter alia*, her refusal to answer questions at deposition). A Court's authority to dismiss claims based on a party's failure to comply with court orders is well settled. HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc., 847 F.2d 908, 916 (1st Cir. 1988), citing Link v. Wabash R. Co., 370 U.S. 626, 630–31 (1962) (footnote omitted). See Fed.R.Civ.P. 37(b)(2)(A)(v). Dismissal is an appropriate sanction especially where the plaintiff has been forewarned of a possible dismissal. HMG Prop. Invs., Inc., 847 F.2d at 918. Here, TS refused to submit to her duly noticed deposition. (SOF ¶ 70). In so doing, neither TS nor her attorneys offered any medical evidence whatsoever to demonstrate that TS was either physically or emotionally incapable of testifying. Nor did plaintiffs seek a protective order. This Court granted defendants' motion to compel TS's attendance at her deposition, warning that if TS failed to appear, "defendants may seek sanctions, including a request that her case be dismissed." (SOF ¶¶ 66, 67); (ECF Doc. No. 52). After being appropriately forewarned, TS nonetheless failed to appear for her

re-noticed deposition in violation of this Court's Order. Such refusal warrants dismissal of TS's claims. See Young v. Gordon, 330 F.3d 76, 83 (1st Cir. 2003) (upholding dismissal where plaintiff refused to submit to deposition after court order). Moreover, defendants are prejudiced by TS's failure to comply with this Court's order, as they are unable to adequately prepare for trial absent her testimony. Figueroa Ruiz v. Alegria, 896 F.2d 645, 649 (1st Cir.1990). TS's claims against defendants must be dismissed.

## V.     CONCLUSION

For the reasons set forth above, this Court should grant defendants' Motion for Summary Judgment under Fed.R.Civ.P. 56 and thereafter enter a Judgment of dismissal in favor of all defendants as against all plaintiffs on Counts I and IV of their Complaint.

Respectfully submitted,

The Defendants,
FORMER CHIEF JOHN F. CARMICHAEL, JR.,
OFFICER ANDREW KIEWLICZ, DET. MICHAEL
BENNER, DET. SGT. RICHARD KELLEHER,
OFFICER THOMAS HART, DET. KYLE GRIFFIN,
OFFICER MATTHEW CROWN and VICE PRINCIPAL
LEE TOBEY,

By their Attorneys,

**PIERCE DAVIS & PERRITANO** LLP

*/s/ Matthew J. Hamel*
_____
John J. Davis, BBO #115890
Matthew J. Hamel, BBO #706146
10 Post Office Square, Suite 1100N
Boston, MA 02109
(617) 350-0950
jdavis@piercedavis.com
mhamel@piercedavis.com

Dated: November 1, 2022

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on November 1, 2022.

*/s/ Matthew J. Hamel*
Matthew J. Hamel, esq.