UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWARD SULLIVAN, HEATHER SULLIVAN, DOE CHILD 1, DOE CHILD 2, DOE CHILD 3 and DOE CHILD 4,<br>    *Plaintiffs*,<br><br>VS.<br><br>TOWN OF WALPOLE, MA, WALPOLE POLICE DEPARTMENT, CHIEF JOHN F. CARMICHAEL, JR., OFFICER ANDREW KIEWLICZ, DET. MICHAEL BENNER, DET. SGT. RICHARD KELLEHER, OFFICER THOMAS HART, DET. KYLE GRIFFIN, OFFICER MATTHEW CROWN, WALPOLE SCHOOL DEPARTMENT and VICE PRINCIPAL LEE TOBEY,<br>    *Defendants*. | C.A. No. 1:20-cv-10484-GAO |

## DEFENDANTS' CONCISE STATEMENT OF
## <u>MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1</u>

In accordance with Local Rule 56.1, the remaining defendants, former Police Chief John J. Carmichael, Jr., Officer Andrew Kiewlicz, Det. Michael Benner, Det. Sgt. Richard Kelleher, Officer Thomas Hart, Det. Kyle Griffin, Officer Matthew Crown, and Walpole High School ("WHS") Vice Principal Lee Tobey (hereinafter "defendants"), hereby submit this Concise Statement of Materials Facts as to which there is no material dispute in support of their Motion for Summary Judgment.

1. Plaintiffs, Edward Sullivan, Heather Sullivan, and their four minor children, SS, TS, CS and BS, were residents of Walpole, MA in 2018. (Complaint, ¶ 1-6 ["Parties"]).

2. The Town of Walpole was the employer of the individually named defendants at all relevant times. (<u>Complaint</u>, ¶¶ 7, 16, attached hereto as **Exhibit 1**; <u>Answer</u> ¶¶ 7, 16, attached hereto as **Exhibit 2**).

3. On October 24, 2018, former Police Chief John J. Carmichael, Jr., Officer Andrew Kiewlicz, Det. Michael Benner, Det. Sgt. Richard Kelleher, Officer Thomas Hart, Det. Kyle Griffin and Officer Matthew Crown were acting in their official capacities as law enforcement officers for the Town of Walpole. (**Ex. 1** ¶¶ 8-14; **Ex. 2** ¶¶ 8-14).

4. In the Fall of 2018, plaintiffs' four minor children, SS, TS, CS, and BS, all attended Walpole Public Schools. (**Ex. 1**, ¶ 18).

5. In the Fall of 2018, SS attended WHS as a sophomore. (SS Deposition, attached hereto as **Exhibit 3**, 15:19-22). SS was fifteen years old at the time. (SS Deposition Ex. 2, attached hereto as **Exhibit 5,** p. 1).

6. On Wednesday, October 24, 2018, a student, KC, questioned plaintiff SS regarding a bruise she had on her cheek. (**Ex. 1** ¶¶ 18-19, **Ex. 3,** 61:1-4, 63:24).

7. KC "report[ed] to school officials that [SS] had been assaulted by her father, Edward Sullivan." (**Ex. 1**, ¶ 20, Benner Deposition, attached hereto as **Exhibit 7**, 12:20-23).

8. WHS Vice Principal Lee Tobey questioned SS about her injuries. (**Ex. 1**, ¶ 21, **Ex. 3** 68:8-11). SS denied that her father caused the injuries. (**Ex. 1**, ¶ 22, **Ex. 3** 68:18-19).

9. Vice Principal Tobey is a mandated reporter within the meaning of G.L. c. 119, § 51A. (Tobey Deposition, attached hereto as **Exhibit 8** 9:2-8).

10. Vice Principal Tobey further advised School Resource Office ("SRO") Thomas Hart regarding her report to DCF. (**Ex. 8**, 13:21-24; SS Deposition Ex. 3, attached hereto as **Exhibit 6**, p. 1). SRO Hart in turn advised Detective Benner. (**Ex. 6**, p. 1).

11. Detective Benner responded to WHS. SRO Hart informed Detective Benner that a student, KC, stated that SS was punched by her father. (**Ex. 7**, 8:23-24, 10:11-14). Detective Benner observed bruising on SS's face. (**Ex. 7**, 20:1-2).

12. Detective Benner testified that his recollection is that SS told KC that her father hit her causing the bruising on her face. (**Ex. 7**, 12:20-23).

13. KC told Vice Principal Lee that SS stated that she did not want to talk about [the incident] because it would destroy her family. (**Ex. 8**, p. 1).

14. Vice Principal Tobey testified that KC reported that SS stated that "it's okay, I'll be out of the house in a couple of years" and that "it happens to me, but at least it doesn't happen to the other kids." (**Ex. 8**, 10:8-22).

15. SS testified that she reported to Detective Benner and Vice Principal Tobey that in the Fall of 2018, she shared a room with her younger brother CS, who was seven years old at the time. (**Ex. 3**, 135:14-19). SS told Detective Benner and Vice Principal Tobey stated that her injuries were the result of her younger brother, CS, falling out of his bed and dropping a water bottle that struck her by accident. (**Ex. 1**, ¶ 22; **Ex. 7**, 12:1-9).

16. SS testified that, on October 24, 2018, the bruise on her right cheek looked fresh and recent because it happened the night before. (**Ex. 3**, 136-137).

17. Vice Principal Tobey testified that SS stated that she got the bruise "from an accident or something with her brother . . . ." (**Ex. 8**, 12:15-18, **Ex. 6**, p. 1, **Ex. 2**, p. 2).

18. Vice Principal Tobey filed a Section 51A report with the Department of Children & Families ("DCF"). (**Ex. 1**, ¶ 23, **Ex. 3**, 69:10-14, **Ex. 7**, 11:2-4).

19. DCF "screened in" Vice Principal Tobey's report as an "emergency report" and thereafter initiated an "emergency response." (**Ex. 4**; **Ex. 5**; Skutul Deposition, attached hereto as **Exhibit 9**, 24:14-16).

20. DCF directed DCF Investigator David Skutul to respond to the Town of Walpole to conduct an investigation into the allegation that SS was abused by her father. (Skutul Deposition 6:11-15).

21. DCF Investigator Skutul testified that, in an "emergency response," investigators try to meet with the child or children within two hours. (**Ex. 9**, 25:7-11).

22. DCF Investigator Skutul testified that his top priority was to view the children "as soon as possible" and that the situation called for "some urgency." (**Ex. 9**, 25:1-6).

23. DCF instructed WPD to temporarily detain SS and the other minor plaintiffs, TS, CS and BS, until it could determine that the health and safety of the children were not in immediate danger. (**Ex. 9**, 27:14-18; **Ex. 7**, 16:2-4; **Ex. 3**,76:14-19).

24. DCF Investigator Skutul testified that either he or the DCF Intake Department would have instructed WPD or WPS to hold the children until he could interview them. (**Ex. 9**, 27).

25. DCF Investigator Skutul testified that DCF's initiation of an "emergency response" was based on the fact that the children were "close to being dismissed from school and returning home to an alleged abuser . . . ." (**Ex. 9**, 24:17-23).

26. DCF Investigator Skutul testified that it was DCF who "made the determination that [the children] should be kept at the school until [he] could conduct [his] interviews." (**Ex. 9**, 26:9-13).

27. DCF Investigator Skutul interviewed SS at WHS. (**Ex. 3**, 79-81, **Ex. 9**, 9:11-14).

28. During her interview with DCF Investigator Skutul, SS denied she had been assaulted by her father, Edward Sullivan. (**Ex. 9**, 9:11-14, **Ex. 3**, 80-81). SS stated that she shared a room with her younger brother, CS, and that CS fell off the top bunk and landed on her. (**Ex. 3**, 122:13; **Ex. 6**). SS further stated and that CS caused a water bottle to fall on her

while she was sleeping. (Id.). SS denied there were any other altercations; she said her brother falling is what caused the bruising on her cheeks. (**Ex. 3**, 129:20; **Ex. 6**).

29. DCF Investigator Skutul testified that he observed bruising on both sides of SS's face immediately when she entered the room. (**Ex. 9**, 29:18-24, 30:1-4; **Ex. 5**, p. 2). DCF Investigator Skutul observed a recent, larger red and blue bruise on SS's right cheek and a smaller, lighter bruise on SS's left cheek. (**Ex. 9** 32-33).

30. DCF Investigator Skutul testified that SS said that the bruising was caused by her brother dropping a water bottle or jumping off the top bunk on down to her. (**Ex. 9**, 10:16-19). SS told DCF Investigator Skutul that her brother "does weird stuff on the top bunk . . . ." (**Ex. 5**, p. 2).

31. DCF Investigator Skutul testified that he had doubts about the accuracy of SS's explanations for her bruising. (**Ex. 9**, 33:14-19).

32. DCF Investigator Skutul testified that, as an investigator, he is trained to look for evidence of physical abuse, including bruises, marks or injuries. (**Ex. 9**, 30:19-24, 31:1).

33. DCF Investigator Skutul testified that he asked SS if he could take pictures of the bruises on SS's face; SS said "No." (**Ex. 5**, p. 7; **Ex. 3**, 95-96; **Ex. 9**, 31:7-9).

34. DCF investigator Skutul testified that typically, alleged victims allow him to take photographs of evidence abuse "[n]inety percent of the time[.]" **Ex. 9**, 31:15-22).

35. Prior to going to WHS, DCF investigator Skutul responded first to Fisher Elementary School where he interviewed CS and BS. (**Ex. 9**, 23-24). During this time period, and at the direction of DCF, CS and BS were temporarily detained at the direction of DCF at Fisher Elementary School until the DCF investigator could speak to them. (**Ex. 1** ¶ 27; **Ex. 3**, 76; **Ex. 6**; **Ex. 9**, 26:9-13, 27:14-24, 28:1-2).

36. DCF Investigator Skutul testified that in the past, he has asked school personnel to detain a child until he could complete his interview. (**Ex. 9**, 28:3-7).

37. DCF Investigator Skutul interviewed CS and BS at Fisher Elementary School. (**Ex. 6**; **Ex. 7**, p. 1-2). Detective Benner sat in on the interviews of CS and BS but did not participate in the questioning. (**Ex. 5**, p. 1).

38. CS denied that he fell or jumped on SS. CS further denied that he dropped anything on SS. (**Ex. 5**, p. 2; CS Deposition, attached hereto as **Exhibit 10** 24-25). CS failed to corroborate SS's explanation for the bruising. (**Ex. 9**, 36-37).

39. CS told DCF Investigator Skutul that he did not sleep in the top bunk the previous night. (**Ex. 5**, p. 2).

40. TS was not in school custody at the time of the DCF investigation but went to the home of a classmate after school. (**Ex. 1**, ¶ 27).

41. At the direction of DCF, WPD requested that the parents of the classmate, Brian and Elizabeth Greely, keep TS at their home until DCF Investigator Skutul could interview her. (**Ex. 9**, 28-29; **Ex. 1**, ¶ 27). The parents complied. (**Ex. 1**, ¶ 27).

42. DCF Investigator Skutul interviewed TS at her classmate's home. (**Ex. 9**, 28:8-12; **Ex. 6**). TS denied any knowledge of her sister's bruises. (**Ex. 5**, p. 3-4). WPD did not participate in Investigator Skutul's questioning of TS. (**Ex. 5**, p. 3-4).

43. At approximately 4:00 p.m., WPD Detective Ian Tolland conducted a traffic stop and arrested Edward Sullivan for domestic assault and battery. (**Ex. 1**, ¶ 28; **Ex. 2** ¶ 28; Edward Sullivan Deposition Day One, attached hereto as **Exhibit 11** 12:13-15, 37-38).

44. Detective Tolland and WPD Officer Matthew Crown took Edward Sullivan into custody. (Crown Deposition, attached hereto as **Exhibit 14** 11:9-14). Officer Crown, who was

acting as backup to Detective Tolland, transported Edward Sullivan to the WPD Police Station. (**Ex. 14** 9:13-16, 11:15-19).

45. Detective Benner and Officer Kiewlicz interviewed Edward Sullivan at the WPD Police Station. (Edward Sullivan Deposition Day Two, attached hereto as **Exhibit 12** 20-21;). The interview was recorded on video. (**Ex. 12**, 18:3-6).

46. Prior to being questioned, Edward Sullivan signed a Miranda Warnings form. (**Ex. 12**, 21:18-21, Edward Sullivan Deposition Exhibit 2, attached hereto as **Exhibit 13**; **Ex. 6**, p. 2). Edward Sullivan was not questioned outside the interview room and indicated he understood his Miranda warnings. (**Ex. 12**, 18:21-24, Kiewlicz Deposition, attached hereto as **Exhibit 15**, 15-16).

47. Edward Sullivan denied assaulting his daughter. (**Ex. 1,** ¶ 28).

48. George "Greg" Hardiman, Heather Sullivan's cousin, assisted the family at the WPD station. (Heather Sullivan Deposition, attached hereto as **Exhibit 16**, 44, 49). Hardiman is an attorney. (**Ex. 16**, 44).

49. DCF Investigator Skutul conducted a home visit at the Sullivan's residence in Walpole. (**Ex. 16**, 63).

50. DCF Investigator Skutul noted that in SS and CS' room, there was a bunk bed, and that the top bunk only had sheets on the bed while the bottom bunk had sheets, a pillow and blankets. (**Ex. 5**, p. 4).

51. After the home visit was completed, Heather Sullivan, SS, TS, CS and BS were able to return to the family residence. (**Ex. 16**, 65).

52. Edward Sullivan was released from custody on personal recognizance on October 24, 2018 at approximately 10:00 p.m. or 11:00 p.m. that evening. (**Ex. 12**, 35-36, 38:10-11; Carmichael Deposition Exhibit 2, attached hereto as **Exhibit 19**, p. 1).

53. After completing its investigation, DCF found the Section 51A report "Unsupported." (**Ex. 5**, p. 1; **Ex. 1**, ¶ 29).

54. In its report, DCF concluded "it is unclear how the injury was sustained, the Department does not have enough evidence to support that the bruising was caused by any action of her father." (**Ex. 5**, p. 8). DCF also raised concerns that it was unclear how the bruising to SS's face was sustained and "that [SS] has offered three varying explanations as to how she sustained the bruising . . . ." (**Ex. 5**, p. 8; **Ex. 9**, 42:12-19, 44:1-4).

55. DCF Investigator Skutul testified that he believed Vice Principal Tobey's Section 51A report was made in good faith. (**Ex. 9**, 48:12-14). DCF Investigator Skutul testified that he did not believe the Section 51A report was a frivolous report. (**Ex. 9**, 48:15-17).

56. DCF Investigator Skutul testified that, in his view as a DCF investigator, the incident was one which should have been reported "[t]en out of ten times[.]" (**Ex. 9**, 48:18-21).

57. Edward Sullivan went to the Wrentham District Court to be arraigned on October 25, 2018. (**Ex. 12**, 39-40).

58. Edward Sullivan was not arraigned on October 25, 2018. (**Ex. 12**, 41:13).

59. Heather Sullivan testified she was aware of some conflict pertaining to Attorney Hardiman's involvement with the case. (**Ex. 16**, 73, 77, **Ex. 17**, 16-17). Heather Sullivan testified that Attorney Hardiman referred the family to another attorney. (**Ex. 16**, 73:14-21).

60. The Norfolk District Attorney's Office ultimately declined to prosecute Edward Sullivan, and a Special Prosecutor entered a Nolle Prosequi prior to arraignment. (**Ex. 1**, ¶ 29, **Ex. 16**, 83; Carmichael Deposition Exhibit. 1, attached hereto as **Exhibit 18**). On November 28, 2018, a special prosecutor filed a notice of *nolle prosequi*. (**Ex. 12**, 89:23-24; 90:1-4).

61. Former WPD Chief John F. Carmichael, Jr. testified that he did not know why Edward Sullivan was not prosecuted when there was probable cause to believe Mr. Sullivan had committed domestic assault and battery. (**Ex. 17**, 15-17).

62. Defendants noticed the deposition of plaintiff, TS, for February 18, 2022. (ECF Doc No. 40, Defendant's Motion to Compel Deposition Testimony of Minor Plaintiff T.S., attached hereto as **Exhibit 20**). Plaintiffs requested that the deposition of Edward Sullivan be held on that date instead. Defendants accommodated the requested scheduling change. (**Ex. 20**).

63. On February 20, 2022, plaintiffs' counsel stated that he "d[id] not believe [T.S.] will be able to submit to [the deposition]." (**Ex. 12**, 160:11-16).

64. On February 25, 2022, plaintiff Heather Sullivan also indicated that she did not believe TS could "handle it" (referring to her deposition). (**Ex. 16**, 90:6-13).

65. Defense counsel offered to forgo conducting TS's deposition if TS agreed, in turn, to dismiss her case. (ECF Doc. No. 40, Defendant's Motion to Compel Deposition Testimony of Minor Plaintiff T.S., Exhibit F, attached hereto as **Exhibit 21**).

66. Defendants filed a motion to compel TS's attendance at her deposition on March 30, 2022. (**Ex. 20**). On June 10, 2022, this Court allowed defendants' motion. (ECF Doc. No. 52, Court's Order Allowing Defendant's Motion to Compel Deposition Testimony of Minor Plaintiff T.S., attached hereto as **Exhibit 22**).

67. In her Order, the Magistrate Judge ruled that: "[i]f T.S. fails to appear for her deposition, the defendants may seek sanctions, including a request that her case be dismissed." (**Ex. 22**).

68. TS has not objected to defendants' Notice of Taking Deposition, nor has TS filed a Motion for a Protective Order. (**Ex. 20**).

69. On August 17, 2022, defendants re-noticed TS's deposition. (Re-Notice of Deposition of TS, attached hereto as **Exhibit 23**).

70. By email dated August 22, 2022, plaintiffs' counsel confirmed that, in violation of the Court order, TS did not intend to appear for her deposition. (Email from Plaintiff's Counsel, attached hereto as **Exhibit 24**).

Respectfully submitted,
The Defendants,
TOWN OF WALPOLE, MA,
FORMER CHIEF JOHN F. CARMICHAEL, JR.,
OFFICER ANDREW KIEWLICZ, DET. MICHAEL BENNER, DET. SGT. RICHARD KELLEHER, OFFICER THOMAS HART, DET. KYLE GRIFFIN, OFFICER MATTHEW CROWN and VICE PRINCIPAL LEE TOBEY,

By their Attorneys,

**PIERCE DAVIS & PERRITANO LLP**

*/s/ Matthew J. Hamel*
_____
John J. Davis, BBO #115890
Matthew J. Hamel, BBO #706146
10 Post Office Square, Suite 1100N
Boston, MA 02109
(617) 350-0950
jdavis@piercedavis.com
mhamel@piercedavis.com

Dated: November 1, 2022

## CERTIFICATE OF SERVICE

       I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on November 1, 2022.

                                      */s/ Matthew J. Hamel*
                                      _____
                                      Matthew J. Hamel, Esq.