7

# In the Matter of:

*Edward Sullivan V.*

*Town of Walpole, et.al.*

*Michael Benner*

*August 16, 2022*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Page 5

1      PROCEEDINGS
2      COURT REPORTER: This is
3  Teresa Costello. I am a Certified Court
4  Reporter, and I am a Notary Public in the
5  Commonwealth of Massachusetts.
6      This deposition is being taken
7  remotely. This witness is appearing
8  remotely from Walpole Police Department,
9  50 South Street, Walpole, Massachusetts.
10     The attorneys participating in
11 this proceeding acknowledge their
12 understanding that I am not physically
13 present in the proceeding room, nor am I
14 physically present with the witness and
15 that I will be reporting this proceeding
16 remotely. They further acknowledge that,
17 in lieu of an oath administered in person,
18 the witness will verbally declare his
19 testimony in this matter under the pains
20 and penalties of perjury. The parties and
21 their counsel consent to this arrangement
22 and waive any objections to this manner of
23 proceeding.
24     Please indicate your agreement by

Page 6

1  stating your name and your agreement on the
2  record, after which I will swear in the
3  witness and we may begin.
4           * * * * * * * * *
5      MR. GRIFFIN: Attorney
6  Robert Griffin. I agree to the terms and
7  conditions of the deposition.
8      MR. BARNETT: Attorney
9  Seth Barnett, I also agree.
10     (Report marked
11     Exhibit 1.)
12     MR. GRIFFIN: Okay. First of all,
13 I'd like to enter as Exhibit 1 the report
14 of the various officers for the incident
15 involved in the arrest of Mr. Sullivan. I
16 have it on my screen now and click screen
17 share.
18     MR. BARNETT: I have a hard copy
19 too, so.
20     MR. GRIFFIN: I'm sorry.
21     MR. BARNETT: I have a hard copy
22 as well so it can be easier.
23     MR. GRIFFIN: Okay.
24           * * * * * * * * *

Page 7

1      MICHAEL BENNER,
2      having been satisfactorily
3      identified and duly sworn
4      remotely by the Notary
5      Public, was examined and
6      testified as follows to
7      direct interrogatories
8  BY MR. GRIFFIN:
9  Q. Good morning, Detective. My name is
10    Attorney Robert Griffin.
11 A. Good morning.
12 Q. I have some questions I'd like to ask you
13    about the incident of October 24th in the
14    arrest of Edward Sullivan.
15 A. Yup.
16 Q. Can you tell me first -- I'd like some
17    background information, Detective. How
18    long have you been a Walpole police
19    officer?
20 A. Since 2011.
21 Q. I'm sorry?
22 A. Since 2011.
23 Q. Since 2011. And what is your current rank,
24    sir?

Page 8

1  A. I'm a Sergeant.
2  Q. In October of 2018 you held the rank of
3     detective, is that fair to say?
4  A. Yes, sir.
5  Q. And at some point -- what shift -- were you
6     on duty on that day on the 24th?
7  A. Yes, sir.
8  Q. What shift were you working, sir?
9  A. The 8 to 4 shift.
10 Q. And at some point, sir, were you involved
11    in an investigation regarding Edward
12    Sullivan?
13 A. Yes.
14 Q. And could you tell me when was the -- when
15    were you first notified that you were
16    needed for this investigation?
17 A. In the afternoon sometime. I have to refer
18    to my report for the exact time.
19 Q. Please.
20 A. 1400 hours.
21 Q. And what did you do when -- what did you do
22    once you received that notification, sir?
23 A. Chief Kelleher asked me to go to the high
24    school to assist with the investigation.

Page 9

1  Q. And Chief Kelleher was the sergeant and
2     detective at the time, is that correct?
3  A. Yes.
4  Q. When you arrived there did you meet with
5     another officer?
6  A. Yes. Andrew Kiewlicz was there. Tommy
7     Hart was there.
8     (Reporter asked for clarification)
9     I think actually it was just Tommy there,
10    and myself and Officer Kiewlicz went over
11    together.
12 Q. And when you and Officer Kiewlicz arrived
13    there, you met with Officer Hart, is that
14    fair to say?
15 A. Yes.
16 Q. And what did you do when you three met at
17    the -- well, actually, this is at the
18    Walpole High School, correct, that we are
19    talking about?
20 A. Yes.
21 Q. When you arrived at Walpole High School and
22    you met with Officer Hart, what did you do
23    at that point in time?
24 A. I don't recall.

Page 10

1  Q. Well, Officer Hart was the school resource
2     officer at the time, is that fair to say,
3     sir?
4  A. Yes.
5  Q. Okay. Did you receive any information from
6     Officer Hart?
7  A. Yes.
8  Q. Okay. What did you receive from -- what
9     information did you receive from Officer
10    Hart?
11 A. That one of the students there was --
12    stated that she was a victim of domestic
13    violence, that she was punched by her
14    father.
15 Q. Okay. And what did you do as a result of
16    receiving that information?
17 A. I don't recall.
18 Q. Did you interview anybody? Did you speak
19    with anybody else? Did you conduct some
20    kind of an investigation?
21 A. I spoke to the assistant principal
22    Lee Tobey.
23 Q. What did Ms. Tobey tell you?
24       MR. BARNETT: To the best of your

Page 11

1     recollection.
2  A. Um, I believe she was filing a 51A.
3  Q. Who was she filing a 51A in regards to?
4  A. Um, the alleged domestic violence for the
5     student and the father.
6  Q. What was the student's name?
7  A. Shawna Sullivan.
8  Q. And did Ms. Tobey tell you anything
9     further?
10 A. Not that I recall.
11 Q. Did she tell you that she brought
12    Ms. Shawna Sullivan to her office and spoke
13    with her?
14 A. I don't recall.
15 Q. Would it refresh your recollection if you
16    looked at your report?
17 A. Yes, sir.
18 Q. Would you take a look at it, sir?
19 A. Yes, sir. It's in my report.
20 Q. Okay. Do you remember speaking with -- do
21    you remember what Ms. Tobey told you at
22    this point?
23 A. I can read from my report, sir.
24 Q. If that's what it takes, okay.

Page 12

1  A. "Lee stated that after becoming aware of
2     the situation she called down the victim
3     and asked her about the bruising. The
4     victim stated that the bruising on both her
5     cheeks was caused by her brother Colin
6     Sullivan, age seven, falling off his bunk
7     and falling on her last night. When asked
8     if the story was truthful, the victim
9     stated that it was."
10 Q. Okay. Did you become aware of any other
11    student that had made a statement to
12    Ms. Tobey that day the 24th of October
13    2018?
14 A. Yes.
15 Q. And who was that student, sir?
16 A. Her friend Kyle Conlon.
17 Q. And are you aware of what Kyle Conlon is
18    alleged to have told Ms. Tobey?
19 A. Yes.
20 Q. What is your recollection of that, what
21    Kyle Conlon had told Ms. Tobey?
22 A. That Shawna told her that the father hit
23    her causing the bruising on her face.
24 Q. Now was Miss Conlon interviewed later on

Page 13

1  that day at the police station, sir?
2  A. Yes, by Chief Kelleher.
3  Q. Okay. And was that interview audio or
4    video recorded that you know of?
5  A. I have no idea, sir.
6  Q. And were you aware that Miss [redacted] stated
7    that there was a third party involved in
8    this conversation, a student by the name of
9    [redacted]?
10 A. No, I did not know that.
11 Q. I'm sorry?
12 A. No.
13 Q. You didn't know that? Okay. Do you know
14   today if anybody has ever interviewed
15   [redacted] from the local police
16   department? Has any interview ever been
17   conducted of [redacted] regarding this
18   incident -- alleged incident on
19   October 24th of 2018?
20 A. I don't know.
21 Q. Now at some point was the Norfolk County
22   District Attorney's office contacted, sir?
23 A. Yes.
24 Q. And who contacted the district attorney's

Page 14

1  office?
2  A. I know I spoke to them.
3  Q. Who did you speak with?
4  A. Suzanne McDermott and Kristen Collins.
5  Q. And what was the conversation you had with
6    them, sir?
7  A. About how we should proceed.
8  Q. And what positions do they hold at the
9    Norfolk County or did they hold at the
10   Norfolk County District Attorney's office?
11 A. They were involved with juveniles. I don't
12   know their exact titles.
13 Q. Well, are you aware that neither one of
14   them are assistant district attorneys?
15 A. I don't know their titles, sir.
16 Q. But are you aware that they are not
17   assistant district attorneys? They're not
18   lawyers. You spoke with them?
19 A. I did not know what their titles are, no.
20 Q. So you spoke with people from the DA's
21   office who you didn't know what their
22   titles were?
23 A. I don't recall.
24 Q. And you don't know what their

Page 15

1  responsibilities within the district
2  attorney's office were, is that fair?
3     MR. BARNETT: Objection. You can
4  answer, if you know.
5  A. I don't recall.
6  Q. Do you know if they had any authority in
7    their job title or job descriptions to
8    consult with outside agencies regarding
9    procedures in criminal investigations?
10 A. I don't know.
11 Q. Well, if I were to tell you that they
12   were -- that they were just victim witness
13   advocates within the office, is that
14   something that would comport with your
15   understanding or you just don't know?
16    MR. BARNETT: Objection. You can
17 answer if you know.
18 A. I didn't know what their titles were, sir.
19 Q. Okay. So you had no idea who you were --
20   you had no idea what authority these
21   individuals had when you spoke with them,
22   is that fair to say?
23 A. Yes.
24 Q. What, if anything, did they advise you to

Page 16

1  do?
2  A. To hold the children at the school so that
3    they could get an immediate response by
4    DCF.
5  Q. Did you ever ask them on whose authority
6    they were giving you that instruction?
7  A. No. I didn't know who they were speaking
8    to if they were speaking to their bosses or
9    who.
10 Q. So you didn't know -- you didn't know where
11   this directive was coming from, is that
12   fair to say?
13 A. Yes, sir.
14 Q. So what did you do after that, Detective,
15   after you spoke with the district
16   attorney's victim witness advocates,
17   Susan McDermott and Kristen Collins?
18 A. I don't recall.
19 Q. Did you go anywhere?
20 A. Yes, to the Fisher School.
21 Q. And who did you go to the Fisher School
22   with, if anyone?
23 A. Andrew Kiewlicz and an individual from DCF.
24 Q. And was that individual Brian Skutul?

Page 17

1    A. Yes, sir.
2    Q. And was Mr. Skutul a response investigator
3       for the Department of Children and Families
4       at the time?
5    A. I didn't know his title. I know he worked
6       for DCF.
7    Q. Did you have any discussions with him, sir?
8    A. I don't recall.
9    Q. Did you ever advise him of the nature or
10      circumstances of your investigation?
11   A. It was four years ago. I don't recall the
12      conversation.
13   Q. Well, I'm not asking you specifically to
14      quote the conversation. What I'm asking
15      you is did you advise him, in general, of
16      the nature and circumstances of the
17      investigation that you were conducting?
18   A. Well, it could have been Tommy, it could
19      have been Andrew Kiewlicz, it could have
20      been Chief Kelleher. I can't say that I
21      did because I don't recall.
22   Q. Were you present when Mr. Skutul spoke with
23      any of the children of Edward Sullivan?
24   A. Yes, sir.

Page 18

1    Q. And which children were you present when
2       Mr. -- excuse me, let me rephrase that.
3       Who did Mr. Skutul interview in your
4       presence, sir?
5    A. The two boys.
6    Q. And that would be ▇▇▇ and ▇▇▇?
7    A. I have to refer to my report.
8    Q. If you need to, please.
9    A. Yes, sir, ▇▇▇ and ▇▇▇.
10   Q. And ▇▇▇ was seven years of age at the
11      time?
12   A. Yes, sir.
13   Q. And ▇▇▇ was five at the time, is that
14      correct?
15   A. Yes.
16   Q. Five-years-old at the time?
17   A. Yes.
18   Q. How long did that interview take, do you
19      recall, roughly?
20   A. No, I don't recall. A couple minutes.
21   Q. A couple of minutes?
22   A. Yeah.
23   Q. After the interview of ▇▇▇ and ▇▇▇
24      what were the next steps that you took?

Page 19

1    A. I think we headed back to the police
2       station.
3    Q. When you say "we," who are you referring
4       to, sir?
5    A. Myself and Andrew Kiewlicz.
6    Q. And did Mr. Skutul go back to the police
7       station as well?
8    A. I don't recall. No. I believe he did,
9       yes.
10   Q. Do you recall if you had any
11      conversation -- not the contents of it --
12      but do you recall if you had any
13      conversation with him when you returned to
14      the police station? I'm referring to
15      Mr. Skutul.
16   A. Me, personally?
17   Q. Yes.
18   A. I don't recall, sir. Can I reference my
19      report?
20   Q. If you need to, yes.
21   A. Sure. I may have spoken to -- I don't
22      recall the conversation.
23   Q. At any point that day the 24th of October
24      in 2018 did you have -- make any personal

Page 20

1       observations of ▇▇▇ Sullivan?
2    A. She had bruising under both of her eyes.
3    Q. And where did you see her?
4    A. In Lee Tobey's office.
5    Q. At the Walpole High School?
6    A. Yes, sir. Yes.
7    Q. And she denied her father ever having
8       struck her, is that correct, sir?
9    A. Yes, sir.
10   Q. Did you take any further action in regard
11      to investigating the circumstances
12      surrounding this alleged incident?
13   A. No, sir.
14   Q. Were you present when Edward Sullivan was
15      interviewed?
16   A. Yes.
17   Q. And it's fair to say Mr. Sullivan was
18      cooperative, correct?
19   A. Yes, sir.
20   Q. You or someone from the Walpole Police
21      Department in your presence advised
22      Mr. Sullivan of his Miranda warnings,
23      correct?
24   A. I don't recall if I was present when that