9

# In the Matter of:

*Edward Sullivan V.*

*Town of Walpole, et.al.*

*David Skutul*

*September 28, 2022*

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



Page 5

1  and we may begin.
2        (Attorney Griffin and Attorney Davis
3  agree to the stipulation.)
4
5            Stipulation
6        It is stipulated by and between counsel for
7  the respective parties that the deposition is to
8  be read and signed by the deponent under the pains
9  and penalties of perjury within 30 days of
10  receipt; and that all objections, except as to
11  form, and motions to strike are reserved to the
12  time of trial.
13        _____
14            DAVID SKUTUL,
15
16  a witness called for examination by counsel for
17  the Plaintiffs, being satisfactorily identified by
18  the production of his driver's license, being
19  first duly sworn, was examined and testified as
20  follows:
21
22            DIRECT EXAMINATION
23  BY MR. GRIFFIN:
24        Q.  Good afternoon, Mr. Skutul.  My name is

Page 6

1  Robert Griffin.  I represent the Plaintiffs in
2  this action, and I'd like to ask you a few
3  questions about your involvement in the Sullivan
4  family from the Town of Walpole, Massachusetts.
5        Could you tell me back in October of
6  2018 how you were employed, sir?
7        A.  In October of 2018, I was a response
8  worker, which is also known as an investigator for
9  the Department of Children and Families at the
10  Arlington area office.
11        Q.  Specifically on the 24th of October of
12  2018, were you notified to respond to the Town of
13  Walpole to conduct an investigation into an
14  allegation of some child abuse?
15        A.  I was.
16        Q.  And could you tell us the details of,
17  like, who that was and where you responded, sir?
18        A.  If I can refer back to my report, I
19  can -- in general, I was -- at the time I was the
20  duty worker, and I was told that there was an
21  emergency response, and I had to respond
22  immediately to allegations of physical abuse.
23        Q.  And where was that?
24        A.  I had to respond to Walpole.

Page 7

1        Q.  Did you go to Walpole High School?
2        A.  I did.
3        Q.  And what happened when you arrived at
4  Walpole High School on the 24th of October 2018?
5        A.  I met with several staff from Walpole
6  High School, and I got an update on what
7  information was relayed to them.  Prior to going
8  to the Walpole High School, I think I also went to
9  another elementary school to meet with a sibling
10  of the alleged victim of this case.  So eventually
11  I ended up at Walpole High School, but when I did
12  go there, I did meet with staff and eventually met
13  with the alleged victim.
14        Q.  Okay.  And did you meet with one of her
15  siblings previously?
16        A.  I believe I did.  I think an elementary
17  school was the first stop that I made.
18        Q.  Do you remember who you saw at the
19  elementary school?
20        A.  The younger sibling.
21        Q.  One of the boys?
22        A.  Yes.
23        Q.  Do you recall the boy's name?
24        A.  Not without referring back to my notes.

Page 8

1  It's been a bit.
2        Q.  Hold on one second.  Can you see that
3  document on the screen, sir?
4        A.  I can.
5        Q.  I apologize.  This thing keeps freezing
6  for some reason.
7        A.  I believe it was [redacted] and [redacted] the
8  two younger siblings.
9        Q.  I'm sorry.  Just hold one more second
10  to unfreeze this thing.
11        (Pause.)
12        Q.  Can you see that one now?
13        A.  I can, yes.  Thank you.
14        Q.  Did you see both of the boys at the
15  same school?
16        A.  I believe so.  It's further up top.
17  It's the very first...
18        Q.  Okay.  And that was the first location
19  you went to on that date, sir, in the Town of
20  Walpole?
21        A.  I believe -- I believe it was.
22        Q.  And after you interviewed the two
23  younger siblings, [redacted] and [redacted], where did you
24  go then, sir?

| Edward Sullivan V. Town of Walpole, et.al. | David Skutul September 28, 2022 |
|---|---|

**Page 9**

1    A. Then to the high school.
2    Q. When you arrived at the high school,
3 who did you first meet with?
4    A. The Principal Lee Tobey -- I'm sorry.
5 Vice Principal, Lee Tobey.
6    Q. Okay. Were there some detectives as
7 well there?
8    A. There was. And from my understanding,
9 there was also other police officers that were
10 also coaching staff that was present as well.
11   Q. All right. And did you have an
12 interview with [redacted] Sullivan at that point in
13 time when you arrived there?
14   A. I did.
15   Q. Who was present in the room when you
16 conducted the interview, do you remember?
17   A. If I can refer to my notes. If you can
18 scroll a little. There you go. Right there.
19   Q. Okay. Go ahead. Do you recall who was
20 with you when you conducted the interview with
21 [redacted]?
22   A. I'm trying to review the notes to find
23 out if I can --
24   Q. I'm sorry. Okay.

**Page 10**

1    (Witness reviewing document.)
2    A. It looked like that the Vice Principal
3 and Detective Mike were present.
4    Q. Okay. And what do you recall [redacted]
5 telling you that day?
6    A. Well, I basically reviewed the
7 allegations, and I kind of asked her about her
8 home situation, how -- I did notice that the child
9 did have bruising on her cheek, and I basically
10 was asking questions around how that was obtained
11 and what possibly could have happened.
12   Q. Did she offer you an explanation as to
13 how she sustained that bruise on her eye?
14   A. She did.
15   Q. What did she tell you?
16   A. She said that it had something to do
17 with her brother dropping a water bottle or
18 jumping off of the top bunk on down to her which
19 caused the bruising.
20   Q. And about how long did you speak with
21 [redacted] that day -- that afternoon?
22   A. If you scroll up, I document the other
23 way. I got there at 2:45. And if you scroll
24 down...

**Page 11**

1    Q. Does that help you?
2    A. Yes. Roughly about an hour.
3    Q. Okay. And so she told you about
4 something -- her brother dropping something off
5 the bunk that struck her that caused the bruises;
6 is that fair?
7    A. Correct. Yes.
8    Q. Now, what did you do after you
9 interviewed [redacted]?
10   A. I went and I interviewed her sister.
11   Q. And would the sister be [redacted]?
12   A. Yes.
13   Q. And where did you interview [redacted]?
14   A. She was at a friend's home, so I went
15 to that friend's location.
16   Q. And who did you go there with?
17   A. I went by myself.
18   Q. And did you speak with [redacted] at that
19 location?
20   A. I did.
21   Q. Do you remember where it was?
22   A. It was at a friend's home. I have the
23 location, 76 Broad Street in Walpole.
24   Q. Okay. And who was present at the home

**Page 12**

1 when you arrived there, do you recall?
2    A. Yes. The maternal grandmother was
3 present.
4    Q. Was there anybody else there?
5    A. There were other people that were
6 gathered around, but due to privacy, I just asked
7 that we isolate, so I didn't get the names of the
8 other people that were in the area.
9    Q. But that was not the maternal
10 grandmother's home, correct?
11   A. It was not the maternal grandmother's
12 home, no.
13   Q. All right. So you didn't have any
14 conversation with any of the other persons that
15 were at that home?
16   A. I don't recall, and I didn't document
17 having any other conversation with anybody at that
18 home.
19   Q. Okay. What did [redacted] tell you?
20   A. I basically just asked her about, you
21 know, the home atmosphere and if she knew anything
22 to do with her sister having any injuries. And
23 she denied seeing or knowing anything about her
24 sister having an injury.

O'Brien & Levine, A Magna Legal Services Company
888.825.3376 - production@court-reporting.com

Page 21

1  Q. Did you yourself ever speak with [redacted]
2  [redacted], the student who is alleged to have
3  reported [redacted]'s report of abuse?
4  A. I did not speak with any other student.
5  Q. No. Okay. Did you speak with anybody
6  else that you can recall in the course of this
7  investigation?
8  A. Other than pediatrician, police,
9  maternal grandmother, the family, I don't recall
10 anybody else outside of that scope.
11 Q. Okay. All right. Thank you,
12 Mr. Skutul, I appreciate your time.
13 A. Thank you.
14
15            CROSS EXAMINATION
16 BY MR. DAVIS:
17 Q. Mr. Skutul, my name is John Davis. Am
18 I pronouncing your name correct as Skutul?
19 A. You are, sir. Thank you.
20 Q. Thank you. I represent the Walpole
21 defendants. Do you have a copy of the report that
22 Attorney Griffin is showing on the screen handy or
23 do you have to look at the screen to see it?
24 A. I do have a copy.

Page 22

1  Q. Okay. Do you have it handy?
2  A. I could. I just have to minimize this
3  screen. I'll be able to pull up...
4  Q. That way I don't have to ask Attorney
5  Griffin to scroll for me.
6  A. I have it, sir.
7  Q. Okay. Thank you. And I'm looking at a
8  -- it looks like there's several documents, but
9  there's one document that is captioned, Child
10 Abuse/Neglect Emergency Response. Is that the
11 report you have handy?
12 A. I am looking at -- yes.
13 Q. And it's a nine-page document?
14 A. I believe it is.
15 Q. Okay. And is that you doing the
16 scrolling as we speak?
17    MR. GRIFFIN: That's me. I'm sorry.
18    MR. DAVIS: No, I'm sorry.
19 Q. So any ways, is the document that
20 you're referring to, Mr. Skutul, the same as the
21 document that Attorney Griffin has been showing
22 you?
23 A. I think the only difference is mine may
24 have some redactions.

Page 23

1  Q. Okay. So if you could refer to the
2  document that you have, the Emergency Response,
3  just at the bottom of Page 1, it details your
4  visit to Fisher School; do you see that?
5  A. Yes, sir.
6  Q. And above that it says, Date and Time,
7  October 24, 3:35 a.m.
8  A. Yeah, I believe that was -- I think
9  that was wrong.
10 Q. Okay. So that should be p.m., correct?
11 A. It should be.
12 Q. Does that -- if you look on Page 2, the
13 time of your visit to Walpole High School is 2:45
14 p.m.
15 A. Yeah, it was -- I remember that school
16 was just getting out, so that's an inaccurate time
17 on that contact date.
18 Q. Okay. But do you think -- I was more
19 interested, Mr. Skutul, in the sequence. Does
20 this refresh your recollection as to whether you
21 went to Walpole High School first or the
22 elementary school first?
23 A. I believe I had gone to the elementary.
24 I apologize. I'm trying to recall because I think

Page 24

1  they were getting out earlier than the high
2  school.
3  Q. I see.
4  A. So I wanted to get in touch with the
5  two non-reported children first because they were
6  due to leave earlier than the high school.
7  Q. Understood. Okay. So let me back up a
8  little bit. My understanding is that this was
9  treated by DCF as an emergency report, correct?
10 A. Correct.
11 Q. And what does that mean, an emergency
12 report?
13 A. It initiates an immediate response.
14 Q. Okay. And by regs, that means that DCF
15 has to conduct an emergency response, correct?
16 A. Correct.
17 Q. Do you know what triggers the
18 classification of a report as an emergency report?
19 A. Yes. The imminent exposure to whatever
20 the allegation is, so in this example here, you
21 have a child that's close to being dismissed from
22 school and returning home to an alleged abuser, so
23 that would have prompted the emergency response.
24 Q. I see. Okay. And then in that case --

Page 25

1  so my understanding is, your top priority is to
2  view the children as soon as possible?
3       A. Absolutely.
4       Q. And so there's some urgency to this,
5  correct?
6       A. Correct.
7       Q. And under the regs, my understanding
8  is, you want to try to meet with the child or
9  children within 24 hours, right?
10      A. Actually with an emergency response, I
11 believe it's within two hours.
12      Q. Within two hours, okay. Just bear with
13 me for a second. And the visit -- my
14 understanding is the visit should be -- should
15 occur in the home unless there are other certain
16 situations, correct?
17      A. Not necessarily. We have to observe
18 the home, but interviews are not specific to the
19 home.
20      Q. Okay. So who decides where the visit
21 -- because you want to see the kids as soon as
22 possible, right?
23      A. Correct.
24      Q. Who determines where you're going to

Page 26

1  meet with the children?
2       A. The children do, where their locations
3  are.
4       Q. Okay. So if the children in this case
5  were at the school at the time DCF received the
6  report, you made the determination that you should
7  go to the school to visit with them?
8       A. Absolutely.
9       Q. So the fact that school is out and
10 they're supposed to then go home, who made the
11 determination that they should be kept at the
12 school until you could conduct your interviews?
13      A. DCF.
14      Q. So did DCF direct the Walpole Police
15 Department to just hold the kids -- or the school
16 system, "Hold the kids until I get there and can
17 interview them"?
18      A. Well, you have to understand this case
19 came in through an 51A, so the Intake Department
20 may have asked that to happen.
21      Q. Okay. You didn't do that?
22      A. I don't recall if I did or not.
23      Q. Okay. But is that the way -- I mean
24 you're familiar with the way -- you've done

Page 27

1  emergency responses before, right?
2       A. Yes. I would have, yes. I would have
3  asked. If the Intake Department did not do that,
4  I would have asked the kids be held until I had an
5  opportunity to interview them.
6       Q. So that they would not return to the
7  home?
8       A. Correct.
9       Q. So you would have asked either the
10 Walpole Police Department or --
11      A. Or the school.
12      Q. -- the school system?
13      A. Yes.
14      Q. And so in either -- just so I'm clear,
15 Intake would have either asked them or if Intake
16 didn't ask them, you would have asked them to hold
17 the kids?
18      A. Correct.
19      Q. Okay. And is that true for the two
20 boys at the elementary school as well as [redacted]?
21      A. If that was the case. Like I said, I
22 remember trying to get there right before
23 dismissal because the buses were actually lining
24 up when I got to the elementary school, so either

Page 28

1  way I would have asked that they be held until I
2  had an opportunity to talk to them.
3       Q. Okay. In the past, Mr. Skutul, have
4  you done that, you've asked school personnel to
5  detain a child until you could conduct your
6  interview?
7       A. Absolutely.
8       Q. Okay. And then there was a third --
9  there was another child, a [redacted] that you
10 interviewed at, I believe you said, 76 Broad
11 Street, correct?
12      A. At the friend's home, correct.
13      Q. Did the Intake -- did DCF Intake or you
14 personally ask this family at 76 Broad Street to
15 keep [redacted] there until you could conduct your
16 interview?
17      A. I believe I may have asked that she --
18 that I -- I found out where she was, and I asked
19 if I could visit there so I can interview her.
20      Q. And who did you ask about visiting
21 there so you could interview her?
22      A. I don't recall.
23      Q. Okay. But there was someone that you
24 asked, "Could you keep her there until I have a

Page 29

1  chance to just chat with ▇▇▇?"
2      A. If I recall correctly, yes.
3      Q. Okay. When you interviewed ▇▇▇ at
4  the high school, referring, again, to your report
5  and so that interview is described, starting at
6  the bottom of Page 2 onto the top of Page 3,
7  correct?
8      A. Correct.
9      Q. Okay. And when you interviewed her,
10 you observed bruises?
11     A. A bruise, yes.
12     Q. And where did you observe that bruise?
13     A. I believe it was under her right
14 cheekbone.
15     Q. Okay. And --
16     A. And there could have been a little bit
17 on the left side.
18     Q. Yeah. I'm looking at the bottom of
19 Page 2, Mr. Skutul. The second full paragraph on
20 the second line, it reads, "When ▇▇▇ entered
21 the room, I immediately saw a larger bruise on her
22 right cheekbone."
23     A. Correct. The smaller one under the
24 left.

Page 30

1      Q. So you saw bilateral bruising, and by
2  that I mean on both sides of her face?
3      A. Not as pronounced, yes. Not equally,
4  but I did see -- yes.
5      Q. Right. There was a smaller one on the
6  left side of her face and there was a larger one
7  on the right side of her face?
8      A. I believe so.
9      Q. Okay. And you described it in your
10 report, "The bruise was red and blue"; do you see
11 that?
12     A. Yes.
13     Q. And do you have any recollection,
14 Mr. Skutul, of how large the bruise was? Was it a
15 half inch, inch, two inches? Do you have any
16 recollection?
17     A. I don't. And I did not document it, so
18 I'm not going to gather a guess.
19     Q. Sure. Sure. As a DCF investigator,
20 are you trained to look for evidence of abuse?
21     A. Of any type of anomaly, yes.
22     Q. So you're looking for bruises or marks
23 or injuries, right?
24     A. Everywhere, not just at the reported

Page 31

1  area, yes.
2      Q. Correct. So when she came into the
3  room, you were consciously trying to see if you
4  could detect any evidence of abuse?
5      A. On every -- on every investigation,
6  yes.
7      Q. Did you take any pictures of the
8  bruising?
9      A. I had asked her, and she said no.
10     Q. Tell me about that. Did you have a
11 cell. phone camera, is that how you take your
12 pictures?
13     A. At the time back in 2018, we were using
14 iPads.
15     Q. Okay. And typically when you were
16 interviewing a victim -- an alleged victim of
17 abuse and you detected marks that may be evidence
18 of abuse, would you ask to take a photograph?
19     A. Yes.
20     Q. Okay. And typically would the victims
21 or the alleged victims allow you to do so?
22     A. Yes. Ninety percent of the time, yes.
23     Q. And so did you bring out your iPad and
24 say something to the effect of, "▇▇▇ may I

Page 32

1  take a picture of your cheek" or "your cheeks?"
2      A. Yes. The iPad was already out because
3  that's what we use to pull up information, which I
4  was referring to, so it was already out, and I
5  asked if I could take a picture, and she said,
6  "No."
7      Q. Okay. Did you have any further
8  discussion about that? Did you talk about why she
9  wouldn't let you?
10     A. No.
11     Q. Did you draw any conclusions from the
12 fact that she would not allow you to take a
13 picture of her bruising?
14     A. No.
15     Q. At one point, I believe you wrote, at
16 the bottom of Page 2, going onto Page 3, "I
17 noticed a mark on the left cheekbone, not as
18 pronounced as the right but a lighter bruise"; do
19 you see that?
20     A. Correct. Yeah.
21     Q. As you sit here now, are you
22 comfortable with the fact that what you were
23 viewing was a bruise, not makeup?
24     A. At the time of my observation, it

Page 33

1   appeared as a bruise to me.
2       Q. And, I mean, you know what mascara
3   looks like, right?
4       A. Yes, but -- yeah, it could have been --
5   from what was reported was smear, but that was
6   later during the investigation, but at the time it
7   appeared there was bilateral bruising.
8       Q. And then you had a conversation with
9   [redacted] about the fact that her story about the
10  bottle dropping onto her, you suggested that her
11  nose might have taken the brunt of the impact,
12  right?
13      A. Yes.
14      Q. So when she explained that either her
15  brother stepped on her or dropped a water bottle
16  on her, did you have doubts about the accuracy of
17  that story based upon the bruising that you were
18  seeing?
19      A. At the time, yes.
20      Q. And then toward the end of your
21  narrative -- your meeting with [redacted], as
22  described in your report, if I can draw your
23  attention to, it looks like, the last about five
24  lines at the bottom, "I, again, addressed a

Page 34

1   concern she had been seen a couple weeks ago with
2   a bruise on her face"; do you recall that?
3       A. Yes.
4       Q. Do you recall the discussion with her
5   about a bruise on her face maybe a couple of weeks
6   ago?
7       A. Yes, I did.
8       Q. And what did she tell you about that?
9       A. That she got hit in the face with a
10  puck, a hockey puck because she plays street
11  hockey.
12      Q. Did that information have any
13  significance for you in terms of your views as to
14  whether or not she was telling you the truth?
15      A. I don't think from what she had told
16  me, I did not relay that incident as the cause for
17  the bruise on the face at that moment because the
18  color of the bruising would not necessitate a
19  two-week-old bruise.
20      Q. Okay. The bruise on her right cheek,
21  just to get back to what you described as the
22  larger bruise, was it a real shiner? I mean you
23  said you could see it immediately when she came
24  in.

Page 35

1       A. Yeah. It wasn't the shiner that you're
2   thinking about under the eye type thing. It was
3   more the cheekbone and it was darker notating a
4   more recent bruise.
5       Q. Okay. Did she -- could you tell
6   whether or not [redacted] had used any sort of makeup
7   to cover up the bruise?
8       A. I could not.
9       Q. Could you tell whether she had arranged
10  her hair in such a way as to try to hide or
11  disguise the bruise?
12      A. From my recollection, she had come in
13  and I did ask that she move her hair so I had a
14  better look at it.
15      Q. And did she cooperate with that?
16      A. Yes. I don't know -- I had no baseline
17  for how she wore her hair previously.
18      Q. Okay. You're familiar with SANE
19  interviews, correct?
20      A. I am.
21      Q. Was it ever discussed with you or
22  within DCF that [redacted] should undergo a SANE
23  interview?
24      A. No.

Page 36

1       Q. Did you ever have any conversation with
2   the parents about a SANE interview?
3       A. No.
4       Q. Do you know whether the parents were
5   ever asked whether they would allow [redacted] to
6   participate in a SANE interview?
7       A. Not to my knowledge.
8       Q. Okay.
9       A. Just to clarify, a SANE interview
10  usually alleges any type of sexual abuse behavior.
11      Q. Understood. I just want to clarify
12  that.
13      A. Okay.
14      Q. So then you said you also interviewed
15  [redacted] and your recollection is that you
16  interviewed him before you interviewed [redacted].
17  Did [redacted] corroborate [redacted] description of how
18  she sustained the bruises?
19      A. If I can refer back.
20      Q. Sure. Sure.
21          (Witness reviewing document.)
22      A. I'm sorry. What was your question
23  again?
24      Q. Sure. Did her brother [redacted]

Page 37

1  corroborate [redacted]'s story as to how she sustained
2  the bruises?
3      A. Not necessarily, no.
4      Q. Did that give you cause to believe that
5  [redacted] was not telling you the truth?
6      A. Not yet. I haven't gathered enough
7  information to determine that.
8      Q. Okay. Okay. Ultimately, if I can,
9  Mr. Skutul, I want to draw your attention to your
10 conclusion. In the report it begins on sort of
11 the bottom half of Page 7; do you see that?
12     A. In what section?
13     Q. There's a section captioned, Conclusion
14 and then Decision and Date says, "Unsupported
15 October 31, 2018"; do you see that?
16     A. I do.
17     Q. So you testified when Attorney Griffin
18 asked you some questions, you found that -- your
19 conclusion was that the allegation was
20 unsupported, correct?
21     A. Correct.
22     Q. And you reviewed that with your
23 supervisor?
24     A. I did.

Page 38

1      Q. And who was your supervisor?
2      A. Laura Rafael.
3      Q. So is that a conclusion that you came
4  to and then you ran it past her or was it sort of
5  a collaborative decision?
6      A. I updated her. As we go along, I
7  updated her literally while I was still in the
8  field, that initial response. And then we have
9  another discussion about it, probably, I forget, a
10 day or two later about what my findings were thus
11 far, and I also consulted my Legal Department.
12     Q. Okay. Without telling me anything
13 about what you learned from the Legal Department,
14 is that something that you would typically do, you
15 would run past -- your conclusion past Legal?
16     A. On an emergency response like this,
17 yes.
18     Q. Okay. And why is that, why would you
19 run an emergency response past Legal?
20     A. We want to determine if there is
21 information that potentially a Care & Protection
22 may be filed.
23     Q. Okay. In looking still in that
24 Conclusion section, there's a box captioned,

Page 39

1  Action Plan; do you see that?
2      A. Yes.
3      Q. And you say, "Due to the unknown
4  explanation of the injury"; do you see that?
5      A. Yes, I do.
6      Q. But [redacted] had told you how she got the
7  injury, correct?
8      A. She reported to me how she got it, yes.
9      Q. So why did you write that the
10 explanation of the injury was unknown?
11     A. There wasn't anything that really
12 corroborated. The younger brother did not
13 corroborate what she had said.
14     Q. So does this mean that you didn't
15 believe [redacted]?
16     A. It means the evidence that I collected
17 did not -- it didn't conclude that that's how the
18 injury happened.
19     Q. Okay. And then looking at the -- on
20 the next page, Mr. Skutul, there is a --
21 two-thirds of the way down right before the
22 Supervisor Comment section, there's a line that
23 reads, "Although [redacted] friends reported that
24 [redacted] disclosed her father had hit her and it is"

Page 40

1  -- [as read.]; do you see that?
2      A. Yes, I do.
3      Q. Okay. So you had information that
4  [redacted]'s friend had reported that [redacted] disclosed
5  that it was her father that caused the injury,
6  correct?
7      A. That's what was reported to us.
8      Q. Okay. But that information from the
9  first complaint witness was something that you
10 factored into your conclusion?
11     A. Well, it was the origination of the
12 complaint or the origination of the allegation.
13     Q. But you testified I think in response
14 to Attorney Griffin's questions that you did not
15 speak to that friend?
16     A. I did not.
17     Q. Okay. And that line continues, "It is
18 unlikely that her brother had fallen on her"; do
19 you see that?
20     A. Yes.
21     Q. And that was one of her -- one of
22 [redacted]'s explanations as to how she got the
23 bruise, right?
24     A. Yes. Either he dropped something or

Page 41

1  fell on her.
2      Q. Okay. And you wrote that it's unlikely
3  her brother fell on her?
4      A. From his own testimony saying that he
5  slept on the bottom bunk that night.
6      Q. Right. The sentence concludes, "The
7  department cannot prove that father had caused the
8  bruising on her face"; did I read that correctly?
9      A. Correct.
10     Q. And when you wrote, "Cannot prove," by
11 what standard? Are you talking about
12 preponderance of the evidence?
13     A. What a reasonable person would believe.
14     Q. What a reasonable person would believe.
15 Okay. And is that the standard that you used to
16 reach the conclusion that the allegation of abuse
17 was unsupported?
18     A. Yes. Free of any feelings, thoughts or
19 beliefs I had to prove.
20     Q. And your conclusion was that a
21 reasonable person would not believe the allegation
22 of abuse?
23     A. That father caused that.
24     Q. That father caused it. But in the

Page 42

1  Supervisor Comment, is that something written by
2  you or by Ms. Rafael?
3      A. Ms. Rafael.
4      Q. Okay. Did you have discussions with
5  Ms. Rafael about what she wrote in the Supervisor
6  Comment section?
7      A. Not prior to her -- I mean not as she
8  wrote that, no.
9      Q. Okay. But you read what she wrote,
10 correct?
11     A. Yes.
12     Q. And in Supervisor Comment she raised
13 certain concerns; do you see those?
14     A. Yes.
15     Q. So one concern she raised is that
16 Shawna sustained bruising to her face and it's
17 unclear as to how the injury was sustained; do you
18 see that one?
19     A. I do.
20     Q. So before you and Ms. Rafael came to
21 the conclusion that the allegation of abuse by the
22 father was unsupported, did you discuss that
23 concern?
24     A. Basically, like I said, we have ongoing

Page 43

1  discussions about this. This is an emergency
2  response so obviously it truncated the amount of
3  time an investigation has, so we talked about it.
4  And after I typed my report up, I submit it for
5  her review.
6      Q. And after you type your report up, is
7  that when she adds the Supervisor Comments?
8      A. Correct. That's the last thing that
9  gets added prior to the report being approved or
10 rejected.
11     Q. Okay. But just to circle back on my
12 question, did you have a discussion with your
13 supervisor about that concern that she expressed
14 in that first paragraph --
15     A. Yes.
16     Q. -- before you reached your conclusion
17 that it was unsupported?
18     A. It was probably the ongoing process,
19 yes.
20     Q. Okay. And even after -- even after she
21 agreed, she says, "I agree with the decision to
22 unsupport the allegation but I have these
23 concerns," right?
24     A. Correct.

Page 44

1      Q. Okay. The second concern is that
2  Shawna has offered three varying explanations; do
3  you see that?
4      A. Yes.
5      Q. And you've mentioned two, you've
6  mentioned that she said something to the effect
7  that Colin fell on her, although he didn't sleep
8  on the top bunk that night. You've mentioned one
9  explanation was that he dropped a water bottle on
10 her, but, again, he didn't sleep on the top bunk
11 that night. What was the third varying
12 explanation that she offered?
13     A. Well, the other one was the -- not from
14 her but from the initial report.
15     Q. I'm sorry. The initial report was that
16 she disclosed -- so are you counting that one that
17 she disclosed that it was -- the bruising was
18 caused by her father?
19     A. Well, sir, this is somebody else's
20 writing, so I can't speak about what the other
21 person is referring to. I can only speak to mine.
22     Q. Fair enough. Fair enough. So your
23 supervisor raised a concern that Shawna had
24 offered three varying explanations. Are you aware

Page 45

1   of whether ▓▓▓▓ offered three varying
2   explanations?
3       A. Well, if you take the initial
4   allegation into consideration as well as the
5   following two, that would be three for me.
6       Q. Okay. I understand.
7       A. I don't have access or I don't have
8   input once the Supervisor Comment is put in, so
9   I'm only -- I'm just guessing regarding the
10  Supervisor Comments.
11      Q. Understood. Understood. So I asked
12  you a moment ago about whether you had a
13  discussion about Concern No. 1 with your
14  supervisor before you reached your conclusion that
15  the allegation was unsupported. Did you also have
16  a discussion with your supervisor about her second
17  concern regarding three varying explanations
18  before you reached your conclusion that it was
19  unsupported?
20      A. Well, we discussed the case in an
21  ongoing fashion, so that's how she knew about the
22  multiple explanations because I told her.
23      Q. Okay. So you did have discussions with
24  your supervisor about her concerns before you

Page 46

1   reached the conclusion that it was unsupported?
2       A. I don't know if it was her concerns or
3   she was just bringing to light the ongoing
4   concerns or what was being brought up during the
5   course of the investigation.
6       Q. Okay. But they do appear in Supervisor
7   Comment?
8       A. At the very end of the report that I
9   don't have access to.
10      Q. Oh. You do not have access to
11  Supervisor Comment in the report you're looking
12  at?
13      A. No. That's the very last thing that
14  gets added to the report prior to the approval.
15  It's not like she writes that and then I can go
16  back in and edit something. I have to submit the
17  report and then the supervisor then reviews it,
18  puts the comment in and then either agrees or
19  disagrees with the findings.
20          MR. DAVIS: Okay. Bob, can you do me a
21  favor, can you scroll down to Page 8 on this
22  document? There you go. That's good. Thank you.
23      Q. So I'm looking at the bottom of Page 8,
24  this section captioned -- begins on Page 8, goes

Page 47

1   onto Page 9, section captioned, Supervisor
2   Comment, Mr. Skutul; do you see that?
3       A. Yes.
4       Q. So have you seen that before?
5       A. Yes.
6       Q. All right. So when I was asking you
7   questions for five minutes about concerns, you
8   know what I'm talking about, you know I'm talking
9   about these concerns that your supervisor put into
10  the Supervisor Comment section of your report?
11      A. Yes.
12      Q. Okay. So you understood that -- strike
13  that.
14          Do you know who reported this to begin
15  with under 51A?
16      A. It was a mandated reporter.
17      Q. Do you know who the mandated reporter
18  was?
19      A. At the time I did.
20      Q. Okay. If I told you that Lee Tobey,
21  the vice principal at the high school reported it,
22  do you have any reason to quarrel with that?
23      A. With the exception of relaying who a
24  mandated reporter is, yeah, I don't disclose

Page 48

1   mandated reporter information. Not in the DCF
2   capacity anymore.
3       Q. Okay. I mean I do have the intake
4   form, so I can confirm it with the intake form.
5           Do you have any reason to believe that
6   the -- that whoever the reporter was, that this
7   was a report not made in good faith?
8       A. I don't believe that.
9       Q. Do you believe it was made in good
10  faith?
11      A. I believe it.
12      Q. I'm sorry. Do you believe it was made
13  in good faith by the mandated reporter?
14      A. I do.
15      Q. Do you believe that it was a frivolous
16  report?
17      A. No.
18      Q. So in your view as a DCF investigator,
19  is it an incident that you agree should have been
20  reported?
21      A. Ten out of ten times, yes.
22      Q. Are you aware of a subsequent 51A filed
23  on the Sullivan family in March of 2020?
24      A. March of 2020? I don't recall.