# 12

VOLUME: II
PAGES: 1 - 163
EXHIBIT: 1 - 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 1:20-cv-10484-GAO

_____

EDWARD SULLIVAN, HEATHER SULLIVAN,
DOE CHILD 1, DOE CHILD 2, DOE CHILD 3 and
DOE CHILD 4,
  Plaintiffs,

vs.

THE TOWN OF WALPOLE, MA, WALPOLE POLICE
DEPARTMENT, CHIEF JOHN F. CARMICHAEL, JR.,
OFFICER ANDREW KIEWLICZ, DET. MICHAEL BENNER,
DET. SGT. RICHARD KELLEHER, OFFICER THOMAS
HART, DET. KYLE GRIFFIN, OFFICER MATTHEW CROWN,
AND OTHER NAMES UNKNOWN TO THE PLAINTIFFS
AT THIS TIME, WALPOLE SCHOOL DEPARTMENT,
VICE PRINCIPAL LEE TOBEY, AND OTHERS AS YET
UNKNOWN TO THE PLAINTIFFS,
  Defendants.

_____

**CONTINUED REMOTE DEPOSITION OF EDWARD S.
SULLIVAN,** taken on behalf of the Defendants, pursuant
to the applicable provisions of the Massachusetts
Rules of Civil Procedure, appearing remotely before
Kristin L. Tucker, Notary Public and Certified
Shorthand Reporter within and for the Commonwealth of
Massachusetts, appearing remotely, on February 22,
2022, commencing at 10:00 a.m., as follows:

**TUCKER COURT REPORTING, INC.**
130 Hemlock Drive
Norwell, Massachusetts 02061
(888) 852-DEPO

Page 17

1  released. The in between I do remember. I would say
2  probably my best estimation within that holding area
3  would have been 45 minutes or so.
4      Q.   Okay. Did anyone come and speak to you
5  while you were in the holding cell?
6      A.   I believe it would have been Benner,
7  Officer Benner, and there was another one I can't
8  pronounce his name, Kiewlicz. It's in the suit as
9  well. And one of them -- I'm sorry. Yes. Do you
10  want me to go on?
11     Q.   Yeah, so were you in the holding cell when
12  they approached you?
13     A.   Yes. They said do I want to make -- you
14  know, get this cleared up? Do I want to make a
15  statement? Something along those lines.
16     Q.   Okay. And both Kiewlicz and Benner both
17  asked you that; is that right?
18     A.   Yeah. I believe Benner might have been the
19  one. I can't remember which one, but then they both
20  were in when they interrogated me. They were both in
21  the interrogation room.
22     Q.   Up until that point, were you able to call
23  anybody?
24     A.   No.

Page 18

1      Q.   Okay.
2      A.   I don't think I was charged yet or booked.
3      Q.   Okay. So I know that your interrogation,
4  the police interrogation was video recorded. Do you
5  remember that?
6      A.   Do I remember that it was? Yes. I assume.
7      Q.   So I do have the video of your interview
8  with the police. I can just pull it up, just so you
9  can identify the individuals, if that's okay.
10          Before I do that, did you make any
11  statements regarding the allegations before you got
12  into that interview room?
13     A.   Absolutely. I said, I didn't do this.
14  This is obviously some kind of mistake. Yeah,
15  something along those lines.
16     Q.   Okay. And did anyone say anything to you
17  in response before you got into the interview room?
18     A.   Something maybe along the lines of, you
19  know, Let's talk this out; let's clear this up. You
20  know, and that was pretty much probably it.
21     Q.   Okay. Was there any questioning outside of
22  that interview room?
23     A.   Not that I can recall.
24          MS. DAVIS: All right. So what

Page 19

1  I'm going to do is I'll just mark this as Exhibit 1.
2          (Exhibit No. 1 was marked for
3          identification.)
4          MS. DAVIS: I'm not going to play
5  the whole thing for you, because that would take a
6  very long time, but what I want to do is I want you to
7  identify who it is that you see in the video. It's
8  just going to take me a second.
9          All right. What I'm going to do is I'm
10  going to share my screen so we can all look at the
11  same thing together and see if -- Hold on just a
12  second.
13          (Video playing.)
14          BY MS. DAVIS:
15     Q.   Do you see what's in front of -- Do you see
16  the video on your screen?
17     A.   (Witness viewing video.) I do.
18     Q.   I'm going to see if the sound is working,
19  because sometimes I don't get this right.
20          Can you hear that?
21     A.   Yes.
22          COURT REPORTER: I'm sorry, Katie.
23  Do you want me to take the audio down? I don't know
24  if I'll be able to.

Page 20

1          MS. DAVIS: No. No. You don't
2  have to take the audio down. I just want to have him
3  identify for the record, and I'll put in the time
4  stamps just so we're all on the same page.
5          BY MS. DAVIS:
6      Q.   So for the record, I have Exhibit 1, which
7  is the video interview of Mr. Edward Sullivan. The
8  time stamp at the bottom says 16:59:52. Beginning at
9  4:59, so almost five o'clock in the afternoon; does
10  that sound about right, Mr. Sullivan?
11     A.   Yeah.
12     Q.   And does this look like the interview room
13  that you went into?
14     A.   I think so. Yeah.
15     Q.   And I'm just going to forward it -- Well,
16  you know what I'll do, I'll play and then I'll stop it
17  once I see the individuals involved, and I'll just
18  have you identify who appears on the video.
19          I'm just going to pause it right here. For
20  the record, it's played at one minute and 15 seconds
21  in.
22          Mr. Sullivan, could you identify the
23  individuals that you see so far on the screen here?
24     A.   I think that's Patrolman Kiewlicz here, and

EDWARD S. SULLIVAN, VOLUME II                    February 22, 2022

Page 21

1    the one standing, that might be Benner.
2       Q.    Okay.  So the officer in the blue sweater,
3    you believe to be Detective Benner?
4       A.    I belive so.
5       Q.    And the officer -- And then there's a blue
6    Under Armour sweatshirt; is that you?
7       A.    That's right.
8       Q.    And do you see there's an officer in the
9    hallway that brought you to the door; do you know who
10   that is?
11      A.    I don't recall.
12      Q.    Okay.  So I'm just going to play it.
13            I'm just going to pause it there at a
14   minute and 38 seconds.  Detective Benner indicated
15   that before they talked to you, they would have to
16   read you your Miranda rights; is that right?
17      A.    Yup.
18      Q.    Do you remember going through your Miranda
19   rights and signing off that you would talk to the
20   officers without an attorney?
21      A.    At the time, yeah, I do.
22      Q.    Okay.  I'm going to stop sharing now.  I
23   may bring that up again later, but for now, we'll just
24   go with that.

Page 22

1            So as you indicated, before you got into
2    the interview room, you don't recall anyone
3    questioning you; is that correct?
4       A.    Nothing formal like that, I don't believe.
5       Q.    Okay.  Maybe:  Do you have to use the
6    bathroom?  Stuff like that.
7       A.    Yeah.  And I do recall me, you know, saying
8    I didn't do what they're -- I didn't do it.  It must
9    be a mistake here.
10      Q.    Okay.
11      A.    I actually -- and I don't even know if
12   it's, you know, too much CSI or whatever, but I was
13   like, I'll take a lie detector test.  And kind of in
14   hindsight looking at that, it's probably silly, but
15   that's how sure I was that there was something not
16   right happening here.
17            MS. DAVIS:  Sure.  Okay.  I'm just
18   going to pull up the -- you indicated a couple of
19   times -- not a couple of times.  You indicated that
20   there were -- you had been read your Miranda rights.
21   I'm going to pull up what I'll mark as Exhibit 2.
22   It's a two-page document.  I'm going to share it on my
23   screen and just see if you recognize either one of
24   these documents.

Page 23

1            (Exhibit No. 2 was marked for
2            identification.)
3        BY MS. DAVIS:
4       Q.    I'll zoom out a little bit, if I can.  So
5    this is the first page.  It's a PDF.  It's two pages.
6    And it's been previously provided to your attorney.
7    It's Bates stamped D199 and D200.
8            So just going on the first page, do you
9    recognize what this document is?
10      A.    (Witness reviewing document.)  Is that the
11   Miranda rights?
12      Q.    Is that your signature that's there where
13   it says, "Sign: Edward Sullivan 10/24/18"?  It looks
14   like 2:20 p.m.; does that sound right?
15      A.    2:20 p.m.?
16      Q.    I think that's what that says, but I...
17      A.    That doesn't seem accurate, though, because
18   on that date, I wasn't home at 2:20.
19      Q.    Okay.
20      A.    The time's wrong.
21      Q.    Is this your signature here?
22      A.    That is my signature.  That would have been
23   the day of the incident, correct?
24      Q.    This says 10/24/18.  Yeah.  I'm not asking

Page 24

1    if, you know -- Do you remember signing this document
2    at all?
3       A.    I remember them giving me something to sign
4    a couple of times.  Sure.
5       Q.    Okay.
6       A.    And under the -- you know, Oh, we want to
7    clear this up.
8            And I was like, Yeah.  I've got nothing to
9    hide.  I'll sign that.
10           But those times are wrong.
11      Q.    Okay.  And you said that you were -- when
12   you were pulled over, did someone read you your
13   Miranda rights?
14      A.    I believe when they said I was under
15   arrest, I believe.  I believe they did.  Yes.
16      Q.    Did anyone ask you to sign anything on the
17   side of the road there?
18      A.    No.
19      Q.    Okay.
20      A.    Not that -- No.  I don't think so.
21      Q.    Okay.  I'm going to show you the second
22   page of Exhibit 2.  So there's what looks like a --
23   maybe a disk that's, you know, photocopied over a
24   document here.



Page 33

1   our house, but they were all there or getting there
2   after the DCF had gone through our home.
3       Q.   Did anyone from DCF come speak to you?
4       A.   No.  Not then.
5       Q.   Okay.
6       A.   No.  They didn't.  They talked to my
7   mother-in-law, Heather, all the children, I would
8   imagine the school and all the police officers and
9   nobody talked to me about it.
10      Q.   Okay.  Do you recall your wife ever saying
11  that ▓▓▓▓▓ had bruising on her face?
12      A.   She -- When the police had talked to me,
13  they said that ▓▓▓▓▓ had two black eyes.  And when
14  Heather had gotten ▓▓▓▓▓, she said she didn't have
15  two black eyes, that she had like a small bruise under
16  her -- I guess it would have been her right cheek.
17  She had a small bruise.
18           And, you know, ▓▓▓▓▓ would wear a lot of
19  make up.  She obviously was upset.  I'm sure there was
20  a lot of mascara running.  I'm not excusing that from
21  being inaccurate, but, you know, it might have
22  appeared that she had two black eyes.  But we actually
23  had her checked out by a doctor the very next day, and
24  we actually have the physical report from Dr. Cohn and

Page 34

1   also Dr. Orlando at Walpole Pediatrics who, in their
2   medical opinions, said there wasn't two black eyes
3   there.  And that was after -- that was about 12
4   o'clock on it would have been October 25th, and we
5   have that paperwork as well.
6           The next day, we asked the Walpole
7   representative, Officer Madden, if he would take a
8   picture of ▓▓▓▓▓ to confirm that she actually did not
9   have two giant black eyes, as was erroneously
10  reported, and he refused to do that at the courthouse.
11      Q.   After you -- I'll kind of loop back around
12  again to the following morning.
13           After you spoke to Heather, what's the next
14  thing you remember happening?
15      A.   Well, they said that I would have to sit in
16  the jail cell for the next, I believe it was, six
17  hours.  That would be because of the nature of what
18  they said I did that they could hold me for six hours,
19  I believe.
20      Q.   Okay.
21      A.   I'm not sure if that was six hours from,
22  you know, point zero, like when they arrested me or if
23  it was after I was booked or whatever.
24      Q.   Okay.  So you were held, and then what's

Page 35

1   the next thing that you remember?  Did you sleep in
2   the jail cell?
3       A.   No.  I didn't.  They said I could do --
4   could get bail -- not bail.  I guess it would be bail.
5   I'm not quite sure what it's called, but basically
6   someone would come out, the magistrate maybe, and they
7   sign something and I'd give them $40.  I think it was
8   40 or $50.  I don't recall.
9           I do remember the officer saying -- I asked
10  if I could write a check, because I didn't think I had
11  enough cash in my wallet, and they said, No, I
12  couldn't write a check.
13           I guess that makes sense, so then I'm not
14  sure if I paid it.  I must have paid it or Heather
15  maybe.
16      Q.   At any point in time did anyone tell you
17  they had to wait for like morning hours for you to see
18  a magistrate?
19      A.   No.
20      Q.   Okay.
21      A.   No.  I don't think so, because the
22  magistrate came out there like whatever time it was
23  that night.
24      Q.   Okay.  So you saw the magistrate that

Page 36

1   night?
2       A.   That's right.
3       Q.   Okay.
4       A.   Whenever the six hours was up, I believe.
5   And I'm saying six hours.  I'm not positive of the
6   law.  It could have been four hours.  I'm not sure,
7   but whatever the law stated, is what they kept me.
8       Q.   Okay.  So for that period of time between
9   the time you spoke to your wife Heather on the phone
10  and the time you saw the magistrate for bail, were you
11  in the holding cell the whole time?
12      A.   Yes.
13      Q.   Okay.  And where did you see the
14  magistrate?
15      A.   I guess at the counter right outside the
16  jail cell.
17      Q.   Okay.  Got it.  Do you remember what
18  magistrate you saw?
19      A.   I don't recall.
20      Q.   In addition to paying that 40 or $50, do
21  you recall any other conditions of bail?
22      A.   I believe they -- Well, I know they said I
23  couldn't go home.
24      Q.   Did they say for how long you could not go

Pages  33 to 36

Page 37

```
1    home?
2        A.    They said, I believe, until I went to
3    court.  I'd have to go to court.
4        Q.    Got it.  Okay.  After you saw the
5    magistrate -- And do you know if someone paid that
6    money immediately or did you have to wait a little bit
7    longer?
8        A.    I don't think I had to wait.
9        Q.    Okay.  So after you saw the magistrate,
10   were you released?
11       A.    Yeah.  Thereabouts, yeah.
12       Q.    Okay.  And where did you go when you were
13   released?
14       A.    Heather picked me up, my wife Heather.
15       Q.    And where did you go?
16       A.    I went to my car.
17       Q.    It was in that parking lot, you said?
18       A.    Yup.  It was still there.
19       Q.    And then what did you do?
20       A.    I went to my mother-in-law's house to
21   sleep, and Heather went to the house and just grabbed
22   clothes and a suit, and yeah.
23       Q.    Do you recall approximately what time you
24   were released?
```

Page 38

```
1        A.    I want to say ten or eleven, somewhere in
2    there.  Eleven maybe.  But, again, I don't want to be
3    tied down to those times.  I don't recall exactly what
4    time it was, but it was about.
5        Q.    Sure.  So it was in the evening.  I guess I
6    was mostly curious, you know, was it four o'clock in
7    the morning?
8        A.    No.  No.
9        Q.    At night?  Okay.
10       A.    No.  It was probably around ten or eleven
11   at night.
12       Q.    Got it.  Okay.  All right.  So you spent
13   the night with your mother-in-law.  What's your
14   mother-in-law's name?
15       A.    Brenda O'Reilly.
16       Q.    Does she live alone or does she live with
17   someone else?
18       A.    She lives with -- She has her four
19   grandkids from my sister-in-law.
20       Q.    Is she their guardian?
21       A.    She is.  And, actually, her name -- We call
22   her Brenda.  Her name is Madeline, but she goes by
23   Brenda.
24       Q.    So Madeline is her legal name?
```

Page 39

```
1        A.    Given name, yes.
2        Q.    Okay.  Got it.  And those four
3    grandchildren are all minors, I assume?
4        A.    Yes.
5        Q.    Or were at the time anyway?
6        A.    That's right.
7        Q.    Do any of those minors go to school with
8    ████████ or went to school with ████████?
9        A.    Yes.
10       Q.    Does she have two boy cousins going to
11   school with her?
12       A.    She has a female and a male cousin --
13       Q.    Okay.
14       A.    -- who would be about the same age as her.
15   One's a year younger and one's a year older, I guess.
16       Q.    All right.  I assume you -- Did you sleep
17   at Brenda's house then?
18       A.    I did.
19       Q.    Okay.  And what's the next thing that you
20   did the following morning?  Just so we're on the same
21   page, it was October 25th, 2018.
22       A.    So I probably woke up about 4:30 in the
23   morning and got up, shaved, put a suit on.  Heather
24   came over probably about seven, I guess, 7:30.
```

Page 40

```
1        Q.    And where did you go?  Did you leave the
2    house then?
3        A.    Yes.
4        Q.    And where did you go?
5        A.    We went to -- We stopped at Dunkin' Donuts
6    on 1A in Walpole, and then we went to the courthouse.
7    She got something.  I didn't get anything at Dunkin'
8    Donuts --
9        Q.    Okay.
10       A.    -- if that's important.
11       Q.    Did you go to the courthouse?  Is this the
12   district courthouse?
13       A.    I believe that's what it is.  It's in
14   Wrentham.
15       Q.    In Wrentham, you said?
16       A.    That's right.
17       Q.    And do you know why you had to go to the
18   courthouse that day?
19       A.    Yeah.  I had to.
20       Q.    What was the purpose of going to the
21   courthouse that morning?
22       A.    So they were charging me with assault or --
23   I forget what it was, actually, but basically hurting
24   my daughter.
```

Pages 37 to 40

EDWARD S. SULLIVAN, VOLUME II                                    February 22, 2022

Page 41

1    Q.   Okay.  Were you there for your arraignment;
2    does that sound right?
3    A.   Well, they were going to -- that was the --
4    Yeah.  I guess that's what it would be.
5    Q.   At that point in time, you had already been
6    charged by the police, correct?
7    A.   The police charged me, yes.  Walpole
8    Police, yeah.
9    Q.   Could you say that again?  I'm sorry.  I
10   didn't hear that.
11   A.   I said the Walpole Police charged me.
12   Q.   Do you recall what time your arraignment
13   was?
14   A.   I want to same nine, nine-ish.  And I think
15   it's just kind of a roll call kind of thing where they
16   call people up or, you know, but they weren't able to
17   arraign me.  They didn't arraign me.
18   Q.   Did you have your attorney there with you?
19   A.   Did I have Bob with me?
20   Q.   Did you have Mr. Hardiman?
21   A.   Mr. Hardiman.  I'm sorry.  Yes.  Yes.
22   Q.   And you said -- How long did you have to
23   wait for your arraignment?
24   A.   I'm not sure.  Again, they didn't arraign

Page 42

1    me, though, but we were there, I'd say, for about
2    three hours that morning.
3    Q.   Okay.
4    A.   And my daughter ▓▓▓▓▓ came as well with my
5    sister-in-law Tara.
6    Q.   You said with your sister-in-law Tara?
7    A.   Yes.  Tara.  Yes.  We named my ▓▓▓ after
8    her.  Yeah.
9    Q.   Is it Tara Robertson?
10   A.   Robinson.
11   Q.   Robinson.  Okay.
12        Is she the sister-in-law whose children
13   live with Brenda?
14   A.   No.  She is not.
15   Q.   Okay.  So it's your wife's other sister
16   then?
17   A.   Yes.  She has two sisters.
18   Q.   Does Tara live in Walpole as well?
19   A.   She does not.  She lives in Plymouth.
20   Q.   And you said that you were there for three
21   hours, but you were not arraigned.  Did they ever call
22   your name or call your case up at all?
23   A.   I don't believe so.  I didn't have to go in
24   there.

Page 43

1    Q.   You didn't have to go in there you said?
2    A.   No.  I was in kind of an anteroom where I
3    just remember there was a couple of copy machines
4    there.
5    Q.   Who was in the anteroom with you?
6    A.   It was Heather, my wife, ▓▓▓▓▓▓, Tara,
7    George.
8    Q.   Okay.  And you waited in the anteroom the
9    whole time?
10   A.   Yeah.  I was there.  I believe.  I believe
11   I was -- I think I had to check in maybe in a
12   different office when I first got there so that they
13   knew that I was there.
14   Q.   Okay.  At any point in time, did
15   Mr. Hardiman leave the courtroom -- or not leave the
16   courtroom -- leave the anteroom to go into court?
17   A.   I don't think so.  I think he was talking
18   to the district attorney, but I don't believe so, but
19   I also don't know.
20   Q.   Do you know who the district attorney was
21   that you talked to?
22   A.   I do not.  No.
23   Q.   Was it a male or female?
24   A.   I'm not sure.

Page 44

1    Q.   What, if anything, did Mr. Hardiman say in
2    the anteroom when ▓▓▓▓▓ and ▓▓ were in the room?
3        MR. GRIFFIN:  Objection.
4        MS. DAVIS:  Well, privilege
5    wouldn't apply if ▓▓▓▓ and ▓▓▓▓▓ were in the room,
6    because there's no attorney-client privilege, so it
7    would be waived at that point in time.
8        MR. GRIFFIN:  Note my objection.
9        MS. DAVIS:  Will you permit
10   Mr. Sullivan to answer that question?
11       MR. GRIFFIN:  If you remember.
12   A.   Could you repeat the question, please?
13   Q.   Sure.  What, if anything, did Mr. Hardiman
14   say in the anteroom when ▓▓▓▓▓ and ▓▓▓ were in
15   there?
16   A.   Nothing as far as the case, I mean, as far
17   as, you know, like what had happened to her or
18   anything like that.  He didn't say -- you know,
19   just -- He was like, Hey, how's it going?  How are you
20   guys doing?  Is everybody okay?
21       But there wasn't any kind of -- that I'm
22   aware of, that I can remember, with them in the room.
23   Q.   Okay.
24   A.   It was very generic, I guess you would call

EDWARD S. SULLIVAN, VOLUME II                           February 22, 2022

Page 89

1  other -- anything else he's involved in that pertains
2  to children being interviewed for criminal cases,
3  anything like that?
4      A.   I'm not sure.  Like you mean like a group?
5      Q.   Yeah.  Do you know if he's a part of any
6  particular organization that interviews children that
7  were witnesses of crime or victims of crime?
8      A.   I'm not sure.  I think so.  I think he's
9  part of like an advocacy group, sure.
10     Q.   Okay.  So when you said Mr. Hardiman was
11 going to work with ██████ was it in that capacity or
12 as her attorney?
13     A.   I think if anything else needed to happen,
14 as far as -- You know, if -- You know, you had
15 mentioned earlier if someone needed to talk to her or
16 anything like that.
17     Q.   Okay.
18     A.   We found that in this case, I guess, we
19 learned a little too late, but, like, it's better to
20 have an attorney represent you from the beginning.  Or
21 whether it's needed, you know, better to have it and
22 not need it than need it and not have it.
23     Q.   Okay.  So what happened when you got to
24 court on November 28th?

Page 90

1      A.   I checked in.  And then I went in and the
2  district attorney's office -- What's it called?  I
3  don't know.  They declined to press any kind of --
4  arraign me or press any kind of charges against me.
5      Q.   Do you hear anyone speak in the court about
6  your case?
7      A.   Just my attorney.
8      Q.   Do you know what your attorney said in open
9  court?
10     A.   No.  I think it -- I want to say the
11 district attorney spoke first and we just agreed.
12     Q.   Does the name Sean Early (phonetic) sound
13 familiar?
14     A.   Sean Early?
15     Q.   The DA, does that sound familiar?
16     A.   It doesn't, but if you say that's the DA at
17 the time, then sure.
18     Q.   Okay.  And do you recall what the DA said
19 in open court?
20     A.   That they weren't going to -- that they
21 basically, I guess, were throwing it out.  And, again,
22 in legal terms, I'm not sure what they call it.
23     Q.   Sure.  I'm just curious what you remember
24 of what was said in open court.

Page 91

1      Okay.  That letter from Dr. Schembri, did
2  you bring that with you to court?
3      A.   I don't believe I did.  You know, we gave,
4  you know, just documents that -- you know, to be like,
5  hey, this is -- in our defense, like, hey, we're
6  not -- I'm not a child abuser or, you know, like I
7  guess we gave it to our attorney.
8      Q.   Did you ever see any documents from the DA
9  about your case at all?
10     A.   No.  And I don't know if they exist.  I
11 mean, I just didn't see anything.
12     Q.   That's fine.  I'm more interested in what
13 you know.
14     After the case was dropped, did you ever
15 have a follow-up conversation with ██████ about her
16 story about the bunk bed?
17     A.   After the case was dropped?  No.  I don't
18 believe so.  I mean, I don't think we talked -- I
19 mean, we could have.  You know, it was an important
20 part of our lives.  I mean, this is pretty impactful
21 to our family.
22     You know, and we ended up moving ██████
23 downstairs.  We finished the room down there for her
24 and all, so that she could have her space.  And we did

Page 92

1  move the room around while we were, you know,
2  temporarily kind of taking care of that downstairs.
3      Q.   Have you ever spoken to ██████ about her
4  explanation for that bruise on her eye?
5      A.   Yeah.  She thought -- That particular bed,
6  it basically had four posts.  I don't know what they
7  call it.  It's the heavy, heavy, heavy wood furniture.
8  But anyways, it had four posts, and she had a metal
9  water bottle on the post.  And she -- Her brother had
10 jumped through -- Like she had a regular bed, and then
11 her brother had gotten up and she thought that he
12 bumped into her bed and the water bottle might have
13 fallen off and hit her.
14     You know, and she -- I asked her, I was
15 like, Well, was it full?  Was it plastic?
16     She said, No.  It was a metal water bottle,
17 and it had water in it.
18     And I'd say the post was -- Like if this
19 was the bed, it would probably be, I don't know, a
20 foot and a half up, maybe a little bit more.
21     Q.   Did you ever suspect that ██████ was lying
22 to you about the water bottle explanation?
23     A.   I don't think so.  I mean, why would she
24 lie?

Tucker Court Reporting, Inc.
(888) 852-DEPO



Page 157

```
 1    here right now, is it really because we're suing you
 2    guys?
 3          And, you know, the cop didn't appreciate it
 4    or say that, but I'm sure they're all aware of it or
 5    you know...
 6       Q.  That's an assumption, right?  You don't
 7    have --
 8       A.  I don't have proof of that.  No.
 9          MS. DAVIS:  Okay.  Mr. Sullivan, I
10    don't have any other questions for you.  I just have a
11    couple of things that I wanted to ask your attorney
12    about, but I don't have any other questions for you.
13          I don't know if your attorney has questions
14    for you for the record at all?
15          MR. GRIFFIN:  No.
16          MS. DAVIS:  Okay.  Then
17    Mr. Griffin, the only thing I wanted to bring up is a
18    couple of documents, just some supplemental record
19    requests.
20          One, I think the school releases won't
21    encompass any records from TECCA, because it's not
22    part of the Walpole School District.  I have Walpole
23    School District and then I have Blessed Sacrament.  I
24    don't think I saw one for TECCA.  I could be mistaken
```

Page 158

```
 1    but...
 2          MR. GRIFFIN:  I thought that
 3    TECCA -- I thought TECCA was a -- like they were a
 4    contract agency for the Walpole School Department.  I
 5    thought they would be encompassed in Walpole.  If
 6    they're not, I'll provide those releases for you when
 7    Mrs. Sullivan gets here.
 8          MS. DAVIS:  That's fine.  My guess
 9    is if it's kind of like an independent charter, the
10    school district probably does not maintain their
11    records for them.
12          THE WITNESS:  Yeah.  That probably
13    makes sense.
14          MR. GRIFFIN:  That could be my
15    mistake, because I assumed that since Walpole -- they
16    were taking these children at the behest of the
17    Walpole School Department, I assumed that Walpole
18    would keep a record of what the child's academic and
19    attendance records were and so forth.
20          MS. DAVIS:  I thought it was an
21    online school with the school district, but it sounds
22    like it functions more like a charter school, and not
23    that it's a charter school, but it sounds like they
24    probably have their own organization.
```

Page 159

```
 1          The other thing I wanted to follow up was
 2    any photographs that Mrs. Sullivan or          may have
 3    of her face kind of before and after, you know, around
 4    that time period.
 5          MR. GRIFFIN:  I'll speak with
 6    Mrs. Sullivan.
 7          MS. DAVIS:  Yeah.  If possible,
 8    I'd just like to see them before I speak to        for
 9    her deposition.
10          And then I think I said if Heather could
11    just be prepared with Attorney Kelley's address or
12    full name or something.
13          MR. GRIFFIN:  I'll get that for
14    you.  I can get that.
15          MS. DAVIS:  Perfect.
16          THE WITNESS:  Let me see if she's
17    texted me back.
18          MS. DAVIS:  And just if there were
19    any other files that Mr. or Mrs. Sullivan have kind of
20    responsive to those requests?  I know Mr. Sullivan
21    indicated that they had a file, so to the extent that
22    any of their files are not contained in the
23    defendants' document production, I would just ask that
24    you provide those.
```

Page 160

```
 1          And then the last thing is I think we owe
 2    the Court a status report on maybe Wednesday or
 3    Thursday, so I can type one up for us, but I think
 4    that's it.
 5          MR. GRIFFIN:  All right.  I'm
 6    going to need an extension of time to do the
 7    depositions as well.
 8          MS. DAVIS:  Yeah.  We can talk --
 9          MR. GRIFFIN:  I'll file a motion
10    for an extension of time.
11          MS. DAVIS:  Okay.  And then you
12    had also indicated you did not think that       was
13    going to be able to do her deposition?
14          MR. GRIFFIN:  Yeah.
15          MS. DAVIS:  Okay.  We can talk off
16    the record about what to do about that.
17          Okay.  And then tomorrow it's both boys; is
18    that right?
19          MR. GRIFFIN:  Yeah.
20          MS. DAVIS:  Is        or
21    going to go -- Who's going to go first?
22          MR. GRIFFIN:  Whatever works for
23    you.
24          MS. DAVIS:  It doesn't make a
```