# 17

# In the Matter of:

## *Edward Sullivan V.*

## *Town of Walpole, et.al.*

## *John Carmichael, Jr.*

## *September 28, 2022*

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



O&L O'BRIEN & LEVINE COURT REPORTING SOLUTIONS
A MAGNA LEGAL SERVICES COMPANY

Case 1:20-cv-10484-GAO   Document 66-18   Filed 11/01/22   Page 3 of 4

Edward Sullivan V.                                                John Carmichael, Jr.
Town of Walpole, et.al.                                           September 28, 2022

Page 13

1      Q. You never instructed anybody to
2  interview ~~Sarah Foley~~ at the time?
3      A. No.
4      Q. And do you see on the bottom of the
5  page, ~~Kyle~~ had also said that during the
6  interview, ~~Sarah Foley~~ had sent an SOS Report to
7  the school because she was concerned about the
8  victim?
9      A. I see that, yes.
10     Q. And nobody from the Walpole PD ever
11 interviewed ~~Sarah Foley~~, is that fair to say, that
12 you know of?
13     A. Not to my knowledge.
14     Q. Other than Officer Hart, did you have
15 any conversations with any other officers in your
16 department or anybody from the Walpole School
17 Department that indicated any suspicious activity
18 regarding ~~Shawna~~ Sullivan and her family
19 situation?
20        MR. DAVIS: I'm going to object to the
21    form, but you may answer, Chief.
22     A. Repeat that, please.
23     Q. Other than Officer Hart, your school
24 resource officer, did you have any conversations

Page 14

1  or discussions with any other members of your
2  department that were involved in this
3  investigation or from the Walpole School
4  Department regarding any possible suspicious
5  activity regarding ~~Shawna~~ Sullivan and her family
6  situation?
7        MR. DAVIS: Same objection.
8        You can answer, Chief.
9      A. As it relates to any other issues, I
10 may have had conversation with Detective Sergeant
11 Kelleher and SRO Hart. I don't recall ever having
12 conversations with other people. Most of my
13 conversations were between myself and the district
14 attorney.
15     Q. Okay. And who -- are you referring to
16 Mr. Morrissey?
17     A. Yes.
18     Q. Did you have other conversations with
19 Mr. Morrissey besides the e-mail correspondence
20 we've previously discussed?
21     A. Yes.
22     Q. And were they by phone, e-mail or any
23 other -- how were those conversations conducted?
24     A. The subsequent conversations were

Page 15

1  conducted via phone.
2      Q. And what, if anything, did you tell
3  Mr. Morrissey in your subsequent conversations?
4      A. What did I tell him?
5      Q. Yes.
6      A. I told him I didn't like how this case
7  was handled. I told him this was a domestic
8  violence incident with a 15-year-old girl. That
9  we had conversation as to what the conflict of
10 interest was, which there was none. And there was
11 conversation as to why this individual wasn't
12 arraigned when there was probable cause to believe
13 that he committed a domestic assault and battery.
14     Q. Well, the determination -- that
15 determination, you know that's up to the district
16 attorney obviously, correct?
17     A. What's up to the district attorney?
18     Q. Prosecutorial authority.
19     A. Right. And we had information from the
20 District Attorney's Office that there was probable
21 cause and to arrest the individual.
22     Q. How did you get information from the
23 District Attorney's Office to that effect?
24     A. There was a conversation between

Page 16

1  Detective Sergeant Kelleher and the DA's office.
2      Q. Who did he speak with in the DA's --
3      A. We had a report of a domestic assault
4  and battery where a police officer has probable
5  cause to believe that that crime was committed.
6  An arrest was made and brought to court, and that
7  individual was not arraigned despite the fact that
8  the clerk of the court said there was probable
9  cause to believe also that this crime was
10 committed, so we know what this is.
11     Q. Well, that's been determined -- that's
12 already been determined by the Court, so --
13     A. Yeah.
14     Q. I understand that you're unhappy with
15 how it happened, Chief, but --
16     A. I'm upset about the why it happened,
17 not as much as that it happened.
18     Q. I'm sorry?
19     A. I'm upset as to why it happened, not
20 what happened.
21     Q. And why do you think it happened?
22     A. I think it happened because the
23 conflict was that this person's attorney works for
24 the NAC and is also on the JNC, and that this

Page 17

1  person was given privileges to avoid being
2  arraigned in court because of who he is, and this
3  does not happen in other cases in that court.
4      Q. So are you accusing the District
5  Attorney's Office of unethical conduct --
6      A. I'll tell you this, that there was
7  probable cause to believe that this person
8  committed assault and battery, domestic violence
9  on his daughter, an arrest was made, and he should
10  have been arraigned, period.
11      Q. Are you accusing the District
12  Attorney's Office --
13      A. I just answered your question.
14      Q. Let me -- I'll ask the questions.
15  Okay?
16      A. And I'll answer them.
17      Q. All right. Let me ask the question.
18  Are you accusing the District Attorney's Office of
19  unethical and unprofessional conduct in --
20      A. I already --
21      THE STENOGRAPHER: I can't hear both
22  of you at once.
23      A. I already provided my answer. It's the
24  same answer.

Page 18

1      Q. So you think it happened because of
2  undue influence by the attorney that represented
3  Mr. Sullivan, that's what you said previously,
4  correct?
5      MR. DAVIS: Objection.
6      A. I believe this person was not arraigned
7  because of who he is, yes. That's correct.
8      Q. So you think it was done because of
9  undue influence then, correct?
10      MR. DAVIS: Objection to the form.
11  Chief, you can answer the question.
12      A. I answered the question.
13      Q. Chief, in your e-mail you indicated
14  that [redacted] Sullivan had changed her story when
15  she was interviewed by DCF; do you recall that?
16      A. I don't.
17      MR. GRIFFIN: I don't think I have
18  anymore questions for you, Chief. Thank you
19  very much.
20      MR. DAVIS: Thank you, Chief. We need
21  your ID, so can you --
22      THE WITNESS: Do you want my driver's
23  license?
24      THE STENOGRAPHER: Yes.

Page 19

1      THE WITNESS: I had someone go get it
2  for me.
3      MR. DAVIS: I have no questions for
4  you. Thank you, Chief.
5      (Exhibits 1 and 2 marked
6      For identification)
7      (Whereupon, the deposition concluded at
8  10:29 a.m.)

Page 20

1          CERTIFICATE
2  Commonwealth of Massachusetts
3  Suffolk ss.
4
5      I, Julie A. Mercier, Registered
6  Professional Reporter and Notary Public in and for
7  the Commonwealth of Massachusetts, do hereby
8  certify that JOHN CARMICHAEL, JR., the witness
9  whose deposition is hereinbefore set forth, was
10  duly sworn by me and that such deposition is a
11  true record of the testimony given by the witness.
12      I further certify that I am neither related
13  to or employed by any of the parties in or counsel
14  to this action, nor am I financially interested in
15  the outcome of this action.
16      In witness whereof, I have hereunto set my
17  hand and seal this _____ day of _____,
18  2022.
19
20
21
22          Notary Public
23  My commission expires:
24  August 17, 2029